THE STATE, DEFENDANT IN ERROR, v. GIOVANNI MAIONI, PLAINTIFF IN ERROR.

Argued June 29, 1909—Decided November 15, 1909.

1. The opinion of a witness has no place in a judicial investigation unless he possesses, with regard to the particular subject of inquiry, a knowledge not acquired by ordinary persons.
2. Questions calling for the opinions of experts, upon mere abstract matters of science, not predicated upon, or related to, the facts established by the proofs in the cause, are incompetent.
3. Under the system of criminal jurisprudence prevailing in this state the defence of insanity only goes to the question of the guilt or innocence of the accused. It does not operate to reduce the degree of guilt.
4. An instruction to the jury that an accused on trial for murder, who sets up insanity as a defence to the crime charged against him, must convince the jury by a preponderance of testimony that his mind was so deranged as to make him irresponsible for his act, does not require him to bear a burden greater than that which the law imposes upon him. The word "convince" in the connection in which it is used, is equivalent to "satisfy," and does not indicate that the defendant must prove his insanity by evidence which would produce absolute conviction in the minds of the jury.
5. An erroneous instruction to the jury upon a matter not involved in the issue being tried, and which could not have misled them or affected them in their determination of the questions before them for decision, affords no ground for a reversal.

On error to Mercer Oyer and Terminer.

For the plaintiff in error, *Martin P. Devlin.*

For the state, *William J. Crossley,* prosecutor of the pleas, and *William R. Piper,* assistant prosecutor of the pleas.

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE. The defendant was indicted for the felonious killing of one Maria Lupo, by shooting her with a pistol, and was convicted of the crime of murder in the first degree. At the trial he sought to escape criminal responsibility principally upon the ground that he was an epileptic, and that when the homicide occurred he was suffering from an attack of the disease, and was totally unconscious of his act done at that time. In support of this line of defence Dr. Cotton was called to testify as an expert, and was asked by counsel for the defendant, among other questions, the following: "If a man be in a highly excited state—or, rather, an epileptic in a highly excited state—what is your opinion about his ability to have a deliberate intent to kill?" This question was overruled upon objection by the state, and its exclusion is made the basis of the first assignment of error. In our opinion the ruling complained of was correct. The witness had, just before this question was asked, testified that an epileptic, between attacks, might be perfectly clear mentally. The excluded question was not limited to the ability of a person to have a deliberate intent to kill during the period of an epileptic attack, or during a specified time before or after an attack. On the contrary, it was broad enough to cover the whole time between such attacks, and to call for the opinion of the expert as to whether an epileptic, at a time when he might be perfectly clear mentally, could, if he was in a highly excited state (even if that state was produced by a cause which would have brought about the same mental condition in an absolutely normal person), form a deliberate intent to kill. Whether a person whose mind is perfectly clear can form a deliberate intent to kill when he is laboring under a high degree of excitement produced by a perfectly natural cause, is a question upon which the opinion

of an alienist is of no more value than that of any other intelligent person, and the opinion of a witness has no place in a judicial investigation unless he possesses, with regard to the particular subject of inquiry, a knowledge not acquired by ordinary persons. But even if the witness could fairly be considered as an expert upon the subject inquired of, the question was, nevertheless, objectionable, for the matter with which it dealt was a mere abstraction. Questions calling for the opinions of experts upon matters of science must always be predicated upon, and relate to the facts established by the proofs in the case. *Shoemaker* v. *Elmer,* 41 *Vroom* 710. Professional opinions upon mere abstract questions of science tend to lead the minds of the jury away from the real points of inquiry and should always be excluded. 12 *Am. & Eng. Encycl. L.* (*2d ed.*) 424, and notes.

The remaining assignments of error are directed at mistakes of law said to exist in the charge of the trial court to the jury. The first of these mistakes is said to have occurred in the instruction as to the scope of the defence of insanity. The charge upon that point was as follows: "The insanity of the defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree. If responsible at all in this respect, he is responsible in the same degree as a sane man, and if he is not responsible at all, he is entitled to an acquittal in both degrees." In the case of *Graves* v. *State,* 16 *Vroom* 347, it was declared by this court that insanity is an affirmative defence; that the burden of proving it is upon the accused; that the law presumes, or assumes, that, at the time of committing the act for which he is tried, he was sane, and that, if he sets up insanity as a defence and fails to establish it, the presumption, or assumption, of sanity still stands. In the case of *Mackin* v. *State,* 30 *Id.* 495, we held that insanity is a defence to crime only when the diseased condition of mind was such that the defendant did not know the nature and quality of the act he was doing, or, if he did know it, that he did not know that what he was doing was wrong. Insanity being an affirmative defence, and that defence being

made out only when the mental aberration is shown to be of
the character defined in Mackin v. State, the failure by the
defendant to prove the existence of such a mental condition at
the time of committing the act charged against him, leaves
the case before the jury in the same situation as if the defence
had not been set up at all, that is, with the presumption ex-
isting that the defendant knew the nature and quality of the
act he was doing and the wrongfulness of it. A person who
has such knowledge stands upon the same plane, so far as
accountability to the criminal law is concerned, as one who
is entirely normal in his mental make-up. There was no
error, therefore, in the instruction complained of.

The defendant further challenges the correctness of the
following instruction to the jury with relation to the burden
of proof upon the question of insanity: "Every man is pre-
sumed to be sane until the contrary is shown, and, therefore,
the burden rests upon the defence to convince you by a pre-
ponderance of testimony that the mind of the defendant was
deranged, and so deranged as to make him irresponsible for
his act." The contention is that this instruction was erro-
neous because (to quote the language of his counsel) "when
the court used the word 'convince' it called upon the defend-
ant to conquer with testimony every doubt that might arise
in the minds of the jurors." In the case of State v. Mangano,
48 Vroom 544, we held an instruction to the jury that when
the defendant sets up intoxication as a partial excuse, "he
must prove it by a preponderance of evidence, he must by the
evidence create such a doubt as to his mental capacity as to
convince you that he was unable to reason or deliberate," to
be erroneous, the ground of our decision being that the use
of the word "convince," in the connection in which it ap-
peared, so leavened the general language of the instructions
as to place upon the defendant a burden which the law did
not require him to bear. In other words, that it nullified
what preceded it, viz., the instruction that the burden upon
the defendant was to prove intoxication by a preponderance
of evidence, and substituted for it the instruction that he
was required to prove it by evidence which would produce a

*conviction* in the minds of the jurors. But the language used in the present case, we think, contains no such instruction; the words used by the court are "convince you *by* a preponderance of testimony." In the Graves case, *supra,* the rule laid down by this court as to the burden of proof in cases where insanity is set up as a defence, is that "the defence must be proved to the satisfaction of the jury, and it may be established by the preponderance of proof." One of the principal definitions of the word "convince" is "to satisfy the mind by evidence" (*Encycl. Dict.* 1225), and this, we think, is the sense which it conveys in the connection in which it was used by the trial judge. Substituting this synonym "satisfy" for the word "convince," the language of the instruction is almost identical with that used by this court in the Graves case. The rule there laid down by us, although not in harmony with that existing in some of our sister states, has been steadfastly held to by our courts ever since the decision in the Spencer case in the year 1843, and is too firmly imbedded in our law to be subject to alteration or modification by judicial decision. The criticism upon this portion of the charge is, in our opinion, without merit.

Error is also assigned upon the instruction of the court to the jury as to the presumption which may arise from the use of a deadly weapon by a person charged with criminal homicide. Upon this point the court charged as follows: "The intention to take life may be presumed from the use of a deadly weapon, a weapon calculated to extinguish life. It is to be presumed that the person who uses the weapon intended to execute the work which the weapon was calculated to accomplish, that is, if a person fires at another with a pistol, and kills him, and there is nothing else shown, the presumption is that he intended to do just what the weapon was intended to do, that is, to kill. This presumption, however, may be overcome if the circumstances leave a reasonable doubt as to whether the intent was to kill." It is contended by counsel that this instruction violates the presumption of innocence, shifts the burden of proof from the state, and makes the presumed or artificial intention to kill, rather than

the actual intention of the person charged with the crime, decisive of one of the vital elements of first degree murder; that its effect was to convey to the minds of the jury that they must find that the defendant had a specific intent to kill from the mere fact that he used a deadly weapon. If the instruction has the effect—conveys the idea—attributed to it by counsel, it is clearly erroneous. A careful analysis of it, therefore, is required. The first statement which it contains is that the intention to take life *may* (not must) be presumed from the use of a deadly weapon. This deliverance seems to us to be incontestably sound. Whether or not such a presumption does or does not arise must, ordinarily, depend upon the facts of the given case. For instance, if A, armed with a pistol which he knows to be loaded, deliberately places the muzzle of the weapon against the temple of B, or against his body in a line with his heart, and intentionally pulls the trigger, the conclusion is irresistible that his purpose is to kill. On the other hand, if he fires at an inanimate target, B being well outside the line of fire, and the ball glances from the target and enters the body of B and kills him, the conclusion is equally irresistible that he did not fire the shot with the intention of killing B. In a case like that first instanced an instruction to the jury that the use of a deadly weapon by A in the manner indicated raised the presumption that he intended to take the life of B would be absolutely unobjectionable, while a similar instruction given in a case presenting the facts secondly instanced would be legally indefensible.

The instruction then proceeds with the statement that it is to be presumed that the person who uses the weapon intended to execute the work which the weapon is intended to accomplish. This is not the statement of a legal rule, but the exemplification of an abstract principle which seems to be applicable, not only to the use of weapons, but to every article manufactured for use. Standing alone it is unobjectionable. The court, however, proceeded to put a meaning upon it which the language itself does not express, by saying "that is, if a person fires at another with a pistol and kills him, and there is nothing else shown, the presumption is that

he intended to do just what the weapon was intended to do, that is, to kill," and it is this part of the instruction more than any other which is made the basis of attack by counsel. We are not prepared to say that a charge to the effect that proof of the mere fact of killing with a deadly weapon, nothing more being shown, raises the presumption that the slayer intended to take life, is erroneous. It is justified by the following statement of Chief Justice Shaw in the case of *Commonwealth* v. *York,* 9 *Metc.* 103: "A sane man must be presumed to intend the necessary natural and probable consequences of his own acts. If, therefore, one voluntarily or willfully does an act which has a direct tendency to destroy another's life, the natural and necessary conclusion from the act is that he intended so to destroy such person's life." It is also supported by the case of *State* v. *Brown,* 12 *Minn.* 538, in which it was held that where the mere fact of killing a human being is shown, and nothing more, the presumption is that it was intentional. Other authorities hold that such proof indicates the intention of the person using the weapon to take life, *or* inflict severe bodily harm. We find it unnecessary, however, to decide which of these presumptions follows from the mere use of a deadly weapon, nothing more appearing, for the reason that in the case before us all the circumstances under which the killing occurred, and the manner in which it was done, were fully described to the jury. The instruction, therefore, as to what would be presumed from the mere fact of a homicide with a deadly weapon, where nothing else was shown, was a matter which the jury were not called upon to consider, and an erroneous expression upon that point could not have misled them, or affected them, in their determination of the question before them for decision, namely, whether the circumstances under which, and the manner in which, the shooting was done, showed beyond a reasonable doubt that it was the intention of the defendant to take life. We conclude, therefore, that if error occurred in this portion of the charge to the jury, it was harmless, and affords no ground for reversal of the conviction under review.

We find nothing in the other assignments of error which calls for comment. It is enough to say that we have examined them and find them without merit.

The judgment under review will be affirmed.

*For affirmance*—THE CHIEF JUSTICE, TRENCHARD, BERGEN, VOORHEES, VREDENBURGH, GRAY, DILL, CONGDON, JJ. 8.

*For reversal*—GARRISON, PARKER, MINTURN, BOGERT, VROOM, JJ. 5.