## ED CHANDLER v. THE STATE.

No. 652. Decided October 19, 1910.

Rehearing Denied November 18, 1910.

### 1.—Murder—Corpus Delicti—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence was ample to show that the body found was that of the deceased and that he died through the criminal agency of the defendant; that the latter was present actively directing operations which resulted in the death of the deceased, etc., the evidence was sufficient to sustain the conviction.

### 2.—Same—Jury and Jury Law—Special Venire—Waiver of Defendant.

Where, upon trial of murder, it appeared that there was good ground to have quashed the special venire on account of the defective service and absence of many of the special veniremen, but it appeared on appeal that defendant had declined and refused to make a motion to quash the special venire, but elected not to do so even on the suggestion of the court, this constituted a waiver with reference to this matter and defendant was in no condition to complain; besides it did not clearly appear whether defendant was entitled as a matter of right to further delay the trial on account of the absence of said veniremen.

### 3.—Same—Evidence—Agreement—Immunity.

Where, upon trial of murder, it appeared that the principal State's witness had entered into a written agreement with the State's counsel that he should be held immune from all prosecution by testifying for the State, and defendant demanded the right to inspect said agreement, to compare the same with witness' testimony, but the State refused to permit said inspection unless the defendant promised to offer the statement in evidence, which was declined. Held, in the absence of any use of said statement to refresh the witness' memory or otherwise, it was not competent to require counsel for the State to produce same and

tender it to counsel for defendant; besides the matter was taken under advisement and not again called to the attention of the court.

**4.—Same—Evidence—Other Offenses—Indictments—Motive.**

Where, upon appeal from a conviction of murder, it appeared from the record that the State had offered in evidence certain indictments against the defendant for felony in which the deceased appeared as one of the witnesses, to show motive on the part of the defendant, there was no error; besides the bill of exceptions was too indefinite.

**5.—Same—Evidence—Impeaching Witness—Bill of Exceptions.**

Where, upon trial of murder, defendant objected to certain testimony which related to the fact as to whether the main State's witness had made a statement to the witness concerning defendant's connection with certain charges of cattle theft, and it appeared from the bill of exceptions on appeal that defendant's objections had been sustained, there was nothing to review; besides the whole matter was harmless.

**6.—Same—Evidence—General Reputation—Truth and Veracity.**

Where, upon trial of murder, the defendant in attacking the general reputation of the State's witness for truth and veracity, placed his questions so that it clearly involved a consideration by the witness of his personal opinion and information concerning the witness to be impeached, there was no error in sustaining an objection thereto by the State.

**7.—Same—Charge of Court—Corpus Delicti.**

Where, upon trial of murder, the evidence raised the question of the corpus delicti and the court fully submitted said issue to the jury in appropriate charges, there was no error in refusing special charges thereon.

**8.—Same—Charge of Court—Accomplice Testimony.**

Where, upon trial of murder, the conviction rested partly upon the testimony of an accomplice, and the court properly submitted this issue to the jury in his charge, there was no error.

**9.—Same—Accomplice—Charge of Court.**

Where, upon trial of murder, it clearly appeared from the evidence that a certain State's witness was not an accomplice, there was no error in the court's failure to submit this matter to the jury.

**10.—Same—Alibi—Charge of Court.**

Where, upon trial of murder, the defendant interposed the defense of an alibi, and the court submitted this question in a proper charge, there was no error.

**11.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, there was sufficient evidence to sustain the conviction of murder in the first degree, the same will not be disturbed on appeal.

Appeal from the District Court of Trinity. Tried below before the Hon. S. W. Dean.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*A. M. Campbell* and *F. Campbell,* for appellant.

*John A. Mobley,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—The appeal in this case is prosecuted from a

conviction for murder in the first degree, had in the District Court of Trinity County on February 16 of this year, in which judgment of conviction appellant's punishment was assessed at confinement in the penitentiary for life.

The case is a very singular one, and it will be necessary to make a somewhat detailed statement of the facts in order to make the opinion understood. The appellant was charged with the murder of one Will Goynes by shooting him with a gun. The State mainly relied for a conviction upon the testimony of Ernest Swinney, who was undoubtedly a principal and an active participant in the death of Goynes, assuming, as the jury must have found, that he was in fact killed. It is shown by the State that Swinney testified under a promise of unconditional immunity from prosecution, conditioned solely that he would make a true statement of the facts touching the murder of Goynes. He testified, in substance, that on the evening of September 7, 1908, appellant approached him about two o'clock in the afternoon, and told him that he wanted him to help him take deceased out of jail; that at first he declined to do so, but that after having spent most of the evening together taking several drinks, he finally agreed to aid in the enterprise, and that in connection with appellant, Howard Magee and Mart Chandler, they did enter the jail and aid in the escape of Goynes therefrom. He says that he took a sixshooter and punched the window light out of a window in the office occupied by the sheriff, went in and got the keys, handcuffs and a butcherknife and went over to the jail. That Mart Chandler and Howard Magee stayed in front of the jail while appellant and himself went on up when he unlocked the jail, got an axe and broke open the inside doors, when Goynes came out with a small grip. That soon after getting out of jail Mart Chandler left them, but that appellant and Howard Magee went away and down into the woods; that appellant and Goynes were walking ahead, and Howard Magee and himself were behind when appellant dropped back to where they were, when they asked him what he was going to do with Goynes, and appellant made the remark, "We will get rid of him," and said, "When I raise my hat you kill him," talking to witness. That he walked on up about twenty feet ahead and raised his hat and witness shot Goynes and killed him. That thereupon Magee, appellant and himself piled up some brush, chunks and stuff and burned him. That at this time he had a 38-55 Winchester, which he had got at one Frank Brent's during the day; that Magee had a shotgun, and appellant a shotgun; that the Winchester was fired four or five times, and the shotgun was fired five times. He also says that he thinks the grip was left where Goynes was burned. The State also introduced one Ramiro Elias, a Mexican, who testified, in substance, that he was working at Frank Brent's restaurant on the day of the escape from jail, and saw appellant, Swinney and Magee at the restaurant; that he overheard them talking and heard them

say something about going and taking a redbone out of jail, at which time they were close to the bar; that they said something to him about being there, and told him to go on back, that it was none of his business; that one of them, he thinks Ernest Swinney, got a gun there, which was a Winchester, 38-55 caliber, and that this gun was brought back by Swinney the next day; that he tried to stop Swinney from getting the gun, but he took it anyway. It was shown that about a month after the escape of Goynes from jail, about three-quarters or a mile from Groveton, evidences of a fire were found in which the blade of a knife was discovered, some bones, some metal pieces that belonged evidently to a valise, and some clothing of a character which had been theretofore worn by Goynes. We think that the testimony of Dr. C. H. Bradley establishes beyond doubt that the bones discovered and produced were the bones of a human being. His testimony, to our minds, shows a perfect familiarity with the nature, aspect and characteristic of the bones of the human body, and demonstrates to our minds beyond serious doubt that these were the bones of some person. Among other portions of the body found was the lower jaw, and the first and second ribs of the human trunk, and a portion of the cerebral spine, as well as a piece of skull, part of the thigh bone, and a piece of the breast bone. This physician, however, was unable to say whether these were the bones of a man or a woman, and also as to whether they were the bones of a negro or white person. Dr. Guy Campbell, a dentist, who testified, gave it as his impression from an examination of the teeth, that the teeth preserved and found must have belonged to a person under thirty years of age. A number of witnesses testified that the knife blade found was, in their opinion, the blade from the butcherknife which had been kept in the sheriff's office. At least one witness heard distinctly about the number of shots which the witness Swinney testified were fired, and at about the time named by him. Other witnesses testified to seeing persons leaving the jail, corresponding in number and proximately corresponding with the time when Swinney said the parties in question had left the jail. It was shown further by the State that an indictment was pending against appellant in Polk County charging him with theft, in which case deceased was a witness. It also appeared that there were five indictments pending in the District Court of Trinity County against appellant, Goynes and another person, charging them with theft. It was made to appear on the trial that appellant had claimed that Goynes had made certain statements concerning appellant's connection with these charges, and the testimony raised the issue clearly that the motive for the killing by appellant was to protect himself against any testimony or disclosures which deceased might make. Appellant sought to show in the first place that Goynes was not dead. He introduced two witnesses by whom he proved that they had seen him under circumstances, however, which did not make it certain that he was the person seen,

but these witnesses stated that in their judgment that the person seen by them was Goynes. The cross-examination of these witnesses, however, was such as quite naturally to lead the jury to doubt their statements. They produced, however, two other witnesses, both of whom testified that they knew Goynes well, and who testified positively that several days after his supposed death that they had eaten dinner with him. These witnesses were Joe Lester and Ode Vaughan, both of whom live in Angelina County. Their testimony was to some extent shaken on cross-examination, but without any very substantial contradiction. It was also shown that some time after the alleged murder of Goynes, that the then sheriff of the county made a trip to Coleman County on information that Goynes was located in that section, but that this trip was without result. No other trace was ever found of Goynes, and unless the testimony of the witnesses above is to be believed, he seems to have utterly disappeared from the earth. An inspection of the entire record has convinced us that there was ample evidence to sustain the finding of the jury affirming that the remains produced in court were those of Goynes, and, of course, that he was dead. We think also there was ample evidence in the record to show that he died through the agency and by procurement of appellant when he was present, actively directing operations which resulted in his death. To set out all the facts leading us to this conclusion would be an almost interminable task, and we deem it unnecessary so to do. We have made this somewhat full statement of the general aspects of the case in order that the opinion may be understood.

1. The first question appearing in the record relates to the action of the court in respect to the impaneling of the jury by which appellant was tried. It is made to appear by proper bill that when the case was called for trial, that a venire of 150 men had been legally drawn to serve as veniremen; that of these only forty-six were served in person, and a very considerable number shown to have been served by written notice, and of these last sixteen were shown to be out of the county. That thereupon appellant asked the court not to require him to announce ready for trial until he should first cause an attachment to be issued for the veniremen who were not in attendance upon the court, to which suggestion the court replied that appellant should first make his announcement, and that if such announcement should be ready for trial he would then issue an attachment as prayed for and would give the defendant a reasonable time in which to have the absent veniremen brought into court, and thereupon appellant announced ready for trial and the attachment was immediately issued and placed in the hands of the sheriff for execution, and that at the same time the court directed the sheriff to summon and bring before the court as talesmen seventy-five or one hundred men in addition to the twenty-eight men for whom the attachment had been issued, the court stating that he would not require appellant to act on the

talesmen until the special venire had first been exhausted. This it seems was on the 16th day of February. On the 18th day of February none of the veniremen for whom the attachment had been issued had been served, nor were they in attendance upon the court, but that fifteen men appeared in court as talesmen. The bill also recites that the sheriff at the time stated that he still had the attachment, and that he had not personally been away from the county seat to summon the absent veniremen. That at this juncture appellant requested the court for such additional delay as might be necessary to require the sheriff to execute the writ and the orders of the court to the end that he might have the benefit of his venire as drawn. The record by various bills shows that as many as five bodies of talesmen were brought into court before the jury was finally obtained, and that when each body of talesmen was furnished him he objected and moved the court to give additional time for the absent special veniremen to be summoned under attachment as theretofore ordered by the court. All these bills of exception, which are quite numerous and lengthy, were approved by the court with the same general explanation and qualification. This explanation is to this effect:

"When the court called for an announcement the State announced ready for trial. The defendant asked that the venire be called. The court permitted it. It developed that a number of veniremen were absent. The defendant then asked for an attachment for these veniremen before announcing ready. The court declined to issue the attachment before an announcement, but stated to counsel for the defendant that he would grant a reasonable time for obtaining the presence of all veniremen who are absent and would have attachments issued for same, after such announcement. The defendant announced ready for trial. The court ordered an attachment to be issued for twenty-eight veniremen, who were not present, and who had not been excused by both sides. He then ordered the sheriff to get seventy-five special talesmen and these absent veniremen and have them report the next afternoon at one o'clock. On that night a norther and snow storm came up, the ground next morning was covered with snow, and by one o'clock only five of these twenty-eight absent veniremen had reported. The court then inspected the return of the sheriff and ascertained that out of the twenty-eight veniremen who did not answer only four had been legally summoned. Of these four information was given to the court that three were sick and unable to attend court and the other one lived something over fifteen miles from the county site. Under these circumstances the court declined to delay the trial in order to obtain the presence and attendance of these veniremen under attachment, but stated to counsel for the defendant that he would permit him to withdraw his announcement of ready and make a motion to quash the venire and the service on account of so many of the veniremen not having been served in person by the sheriff, as required by law, and that further

than this he did not have a right to go and defendant declined to withdraw his announcement. On the first day in consultation with A. M. Campbell, of counsel for the defendant, the court had suggested to him that he believed it would be impossible to get a jury in Trinity County unless the case were tried at the present term of the court and unless the venire that had been summoned were used, and that it would be necessary to change the venue unless a trial were obtained. Previous to this statement by the court the said counsel for defendant had stated to the court that he did not desire a continuance of the case and would not make a motion to quash the venire and the court in making the subsequent statement to counsel did not make same as a threat, but made it as a statement of his view of the conditions then existing in Trinity County, and as a statement of what would be necessary to be done and the court's view of the necessities of the case had not at any time been questioned by anyone connected with the case, but seemed to have been concurred in by all, and the defendant's acceptance of the situation was because his counsel recognized the situation and saw that the venue would have to be changed unless a trial could be had at the present term of the court. And the court now says that he would not and could not attempt to get another jury in Trinity County, and that a new trial on account of this action of the court, or on any other account would necessitate a change of venue in this case, and the court states as a fact that the number of qualified jurors in Trinity County is not large and a large percent reside in the town of Groveton and were so familiar with the case, and the case was so notorious over the county that at least six out of seven who were examined on their voir dire disqualified. The court had ordered a venire of 150 and a large number of special talesmen and the court then believed and now believes that the only way a trial could have been secured in Trinity County was for the defendant to accept this venire as he did and to proceed with the trial of the case. The court states further that it has been the custom and practice of sheriffs in the various counties in this district to summon the venires by mailing or sending written notices to the said veniremen severally and said practice had been concurred in and no objection made thereto, and this is the first case within the knowledge of this court that any objection had ever been made thereto and by way of explanation the court states that a large part of the venire in this case had been summoned in this way by the sheriff of Trinity County. A number of them responded to such service and a number did not do so for reasons not known to the court."

That it would have been good ground to have quashed the special venire on account of the absence of so large a portion of such special venire may be conceded. In view, however, of the conditions described by the court, and the delay which intervened between the issuance of the process and the objections of counsel, it is not certain

in any event that appellant was entitled, as a matter of right, to further delay the proceedings. However this may be, it seems clear to us that where, as in this case, he had declined and refused to make a motion to quash the special venire, but elected not to do so even on suggestion of the court, that these facts constitute a waiver and that he is in no condition to complain. This we are more inclined to hold in view of the fact that as shown by the record no objectionable juror was imposed on appellant. While the record shows there was objection to some of the talesmen, in every case they were challenged and no objectionable juror was forced on him.

2. On the trial it was developed that the witness Ernest Swinney had on 29th day of December, 1909, entered into an agreement in writing with the officers of the State whereby he should be held immune from all prosecutions then pending against him, and it appeared in connection with his testimony that he had made a written statement touching the case, whereupon appellant, through his counsel, demanded the right to inspect the written agreement and statement, stating to the court that he made the request for the purpose of using it, as they thought they had a right to compare the statement with the statement he is now making on the witness stand. It was admitted, as the bill recites, that the State was in possession of the papers, and agreed to permit the inspection only upon the condition that the defendant would promise to offer them in evidence to the jury. In this connection the bill recites that the court made the following statement: "At this time I do not think I have the authority to require counsel to produce this statement, and for the present I will not require it. If you find any authorities on this point I will hear them." This bill is approved with the following qualification: "That the proposition made by the district attorney to defendant's counsel was in substance as follows: 'We will let you have the statement provided you will either offer it in evidence yourself, or permit the State to offer it.' Further, this statement was one made by the witness, Ernest Swinney, and was not taken in any judicial proceeding, insofar as the record discloses." It should be further stated that neither this witness nor any other witness stated any single fact or particular or matter of any kind contained in the written statement. His testimony is only to the effect that he had made an agreement to become a witness for the prosecution on a promise of indemnity, and that he in connection therewith made the counsel for the prosecution a statement of the facts within his knowledge. In the absence of any use of the statement either to refresh the witness' memory or otherwise, it was not competent, we think, to require counsel for the State to produce it and tender same to counsel for appellant. It should be further observed that the action of the court in this matter was not unconditional and final. He seems to have taken the matter under advisement with the statement that at that time he would not admit the

testimony, but would hear counsel later and would reserve his decision. So far as the bill shows, the matter was not again called to the attention of the court, and no further effort made to secure an inspection of the documents in question.

3. Counsel objected to the several indictments mentioned above, but the bill in respect to this matter is very imperfect. After setting out the indictments by number and style of the case it contains the following statement: "To the admission of each and all of the instruments above stated defendant objected, which objections were overruled and to which ruling of the court defendant then and there in open court excepted." This bill is allowed with the following qualification: "These indictments were offered by the State and permitted by the court to be introduced in evidence on the question of motive and in connection with the testimony of the witnesses, J. T. Laughlin and Ernest Swinney, and with the indictment from Polk County subsequently offered and introduced in evidence." If it can be conceded that the objection was sufficiently definite to authorize a review of the question, we think there can be no doubt that for the purpose offered this testimony was admissible.

4. During the trial, while the witness J. T. Laughlin was on the stand, the question arose as to the admissibility of a portion of his testimony which related to the fact as to whether the witness Swinney had make a statement to him concerning appellant's connection with certain charges of cattle theft. The bill covering this matter is allowed with a qualification that practically destroys it. The court's statement of the matter is to this effect: "The State asked the witness J. T. Laughlin if Will Goynes had made a statement to him. To this question the defense objected. The court overruled the objection and permitted the witness to state only the facts as to whether Goynes had made a statement. The witness stated that Goynes had made a statement. Then the State asked the witness whether in the statement Goynes implicated Chandler, himself and others in the cattle theft cases. The defendant objected to this and the jury was withdrawn and objections argued. After argument, the State withdrew the question, reserving the right to again offer the testimony. Subsequent to the introduction in evidence of the Polk County indictment against Ed Chandler for cattle theft, showing the name of Will Goynes on the back of the indictment as a witness, the State again offered this testimony and the defendant renewed his objection thereto. The jury was again retired, and after argument the court sustained the objection of the defendant and the witness was not permitted to answer the question." As the bill is approved by the court it is robbed of any objectionable features, and if we should hold even that the mere fact that Swinney had made a statement to Laughlin was inadmissible, in the absence of any proof that such statement reflected in any way on appellant, it

must be obvious that we could not on any fair consideration hold it hurtful.

5. While the witness Virgil Winslow was on the witness stand, after having testified that he was acquainted with the general reputation of Ernest Swinney for truth and veracity in the community in which he lived, and that this reputation was bad, counsel for appellant then asked the witness the following question: "Now, Mr. Winslow, from what you know of Ernest Swinney, and from what other people say about him, do you believe that he is entitled to credence under oath?" To this question and the answer sought to be elicited thereby counsel for the State objected on the ground that as far as counsel could go would be to prove the witness' general reputation, and that it was a matter for the jury to pass upon as to the credibility of the witness and not a matter for the witness to decide. We had occasion in the recent case of Edgar v. State, 59 Texas Crim. Rep., 538, 129 S. W. Rep., 141, to pass on a question very similar to this where it was held that such question was not competent. It clearly involves a consideration by the witness of his personal opinion and information concerning Swinney not disclosed to the jury and which it would not have been proper to have disclosed, and the answer sought under all the authorities was improper.

6. Counsel for appellant requested two special charges, which are in these words:

"Defendant asks the court to charge the jury that defendant is charged with the murder of Will Goynes. If, in the whole evidence you have a reasonable doubt of the death of Will Goynes, you will acquit the defendant, and say by your verdict not guilty.

"Defendant asks the court to charge the jury that the defendant is charged with causing the death of Will Goynes. If you have a reasonable doubt that Will Goynes is dead, you will acquit the defendant, no matter what other facts you may find."

There was no error in refusing these charges since the purport of them had been given by the court, as will appear by reference to the following paragraphs of the court's charge:

"If you believe from the evidence that the said Will Goynes has been seen since the alleged jail delivery and the alleged killing, as charged in the indictment, or if you have a reasonable doubt as to whether the said Will Goynes has been seen alive since said date, you should acquit the defendant.

"Now, if you have a reasonable doubt as to whether the said Will Goynes is dead, you will acquit the defendant.

"If you have a reasonable doubt as to whether the said Will Goynes was killed on or about the time charged in the indictment by Ernest Swinney, acting together with Ed Chandler as principal, as the term principal is hereinbefore defined to you, you will acquit the defendant, Ed Chandler."

7. Again, it is urged that the charge of the court on the subject of accomplice testimony is erroneous, because, as claimed, in no portion of said charge were the jury instructed that they can not convict the defendant upon the testimony alone of the witness Swinney unless they should first believe that his testimony is true and connects the defendant with the offense charged, and that they could not convict upon his testimony unless they should believe there is other testimony in the case corroborative of his testimony and tending to connect appellant with such offense, and that in this connection the court erred in that he did not charge the jury that such testimony, if found, should connect the defendant with the offense charged to have been committed, and further, that the court erred in his charge on this subject in that the jury were not instructed that the corroboration is not sufficient if it merely shows the commission of the offense charged. An inspection of the court's charge will demonstrate that counsel are in error in assuming and claiming that the court had not, in substance, given the charges, the failure of which their motion complains. In the fifteenth and sixteenth paragraphs of the court's charge we find the following:

"A conviction can not be had upon the testimony of an accomplice unless corroborated by other evidence connecting the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense. An accomplice, as the word is here used, means anyone connected with the crime charged, either as principal, accomplice or accessory. It includes all persons who are connected with the crime by an unlawful act or omission on their part, transpiring before, at the time of, or after the commission of the offense, and whether or not they were present and participated in the commission of the crime.

"Now, in this case you are charged that the undisputed testimony shows that Ernest Swinney was an accomplice in the commission of the offense with which the defendant stands charged, if any was committed, and you are instructed that you can not find the defendant guilty upon his testimony, unless you first believe that the testimony of the said Ernest Swinney is true, and that it shows beyond a reasonable doubt that the defendant is guilty as charged in the indictment, and unless you further believe from the evidence, beyond a reasonable doubt, that there is other evidence in the case, outside of the testimony of the said Ernest Swinney, connecting the defendant with the commission of the offense charged."

This charge is in accordance with the approved precedents and clearly and lucidly submits the whole matter to the jury under appropriate instructions. The charge, taken as a whole, contains a most excellent submission of the issues, and among other things, instructs the jury with reference to the doctrine of circumstantial evidence which, under the facts, was unnecessary, and in the twenty-first and twenty-second paragraphs gives the following timely and

appropriate instructions which, while not possibly demanded, were eminently proper to have been given:

"In prosecutions for murder it is always incumbent on the State to establish the corpus delicti clearly and satisfactorily. This corpus delicti consists of: 1st. A criminal act. 2d. The defendant's agency in the commission of such act. In such cases the burden of proof is on the State to show: 1st. The death of the party alleged to be dead, and that the death was produced by the criminal act of someone other than the deceased, and was not the result of accident or natural causes. 2d. That the defendant participated as a principal in the act which produced the death.

"And you are further instructed that no person shall be convicted of any grade of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the death of the person charged to have been killed. And so in this case unless you are satisfied from the evidence, beyond a reasonable doubt, that portions of the body of the said Goynes have been found and sufficiently identified to establish the death of the said Goynes, you should acquit the defendant."

8. Again, complaint is made that the court erred in not instructing the jury or submitting the issue to the jury as to whether the witness Ramiro Elias was an accomplice. An inspection of the statement of facts will disclose that this witness was not an accomplice. It is true he overheard a brief portion of their conversation, but he was not a party to their enterprise, had no portion or part in it, and the fact that the gun was taken from the house where he was working over his protest and against his wishes would not make him an accomplice.

9. In a letter to the Assistant Attorney-General, which we find among the papers (there is no brief on file) he is requested to call the court's attention to the failure of the trial court to charge on the subject of alibi, with the suggestion that this is fundamental error. This suggestion was made evidently without an inspection of the record and is not justified by it. Section 20 of the court's charge is to this effect: "In this case the defendant has interposed, among other defenses, what is known in legal phraseology as an alibi, that is, at the time the offense was committed, if any, the defendant was at another and different place than that in which such offense was committed and therefore was not and could not have been the person who committed such offense. Now, if you have a reasonable doubt as to the presence of the defendant on the ground where the offense was committed, if any, at the time of the commission thereof, you should acquit the defendant." It should be further added that this matter is not complained of in the motion for new trial.

We have thus discussed practically every question raised in the record. The case is a very singular one, and it is possible, of course, that appellant may not be guilty. The State's case, however, was

developed and marshalled with great skill and directness, and there is, as we believe, testimony in the record which, if believed by the jury, might well justify them in finding appellant guilty of this most horrible crime, and in view of the fact that their verdict has received the approval of the learned trial court, who had opportunity at first hands to form a correct judgment of the truthfulness of the witnesses and the weight to be given to their testimony, we do not feel that we ought on appeal to interfere with or set aside his action.

It is therefore ordered that the judgment of conviction be and the same is hereby in all things affirmed.

*Affirmed.*

[Rehearing denied November 18, 1910.—Reporter.]