No. 16,049.

BATTALINO *v*. THE PEOPLE.
(199 P. [2d] 897)

Decided November 1, 1948. Rehearing denied November 15, 1948.

Mr. CARL CLINE, for plaintiff in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE STONE delivered the opinion of the court.

PLAINTIFF in error, Robert S. Battalino, was convicted of murder of the first degree for the killing of Michael Hugh Randolph.

Randolph, at the time of his death, was engaged in the operation of a restaurant in Denver. Battalino and his wife both had been employed briefly at the restaurant, the latter as a waitress and the former as a fry cook.

Some time before the homicide that employment had terminated. Battalino testified both that they quit, and that they were "fired." Other employees testified that Battalino and Randolph engaged in frequent disputes, that the latter accused Battalino of taking money from the cash register and that Battalino threatened "to get" Randolph or to "rub him out." Another employee of Randolph in the restaurant named Miller became intimate with Battalino and left his employment there at about the same time. The two men, according to the statement of each of them, went together to the restaurant in Miller's car late on the evening of the homicide, taking a gun which was being kept by Miller at the request of a friend, and waited until Randolph closed the restaurant for the night, when Battalino forced him at gunpoint to climb into the Miller car and ordered Miller to drive toward the mountains. After driving up the main highway some distance beyond Conifer Battalino ordered the car stopped, the other two men out, through the fence and down a slope some 125 feet from the main highway beside a large rock where he first gave Randolph an opportunity to pray and then shot him in the forehead. Battalino and Miller returned to the car and came back to Denver. The following morning Battalino left town and shortly thereafter was joined by Miller in Omaha. Randolph's body was discovered several weeks later, whereafter, Battalino and Miller were traced to Omaha and placed under arrest. Each made a written statement admitting his part in the kidnapping and killing. Miller in his testimony at the trial in all essentials corroborated Battalino's written confession and there was other substantial corroborating evidence. Upon arraignment defendant pleaded not guilty and not guilty by reason of insanity. He was given a separate trial whereat the jury returned a verdict of guilty of murder of the first degree and fixed the penalty at death.

The first assignment of error here urged is the refusal of the trial court to give the jury an instruction on mur-

der of the second degree and a form of verdict permitting it to find defendant guilty of murder in that degree. This assignment is based on the ground that there was evidence of insanity of defendant introduced, and although the jury found that the defendant was not so diseased in mind as to be incapable of distinguishing right from wrong or of choosing the right and refraining from doing wrong, still if permitted, it might have found that he was incapable of that wilful deliberation and premeditation essential to murder of the first degree, and, therefore, he was guilty of murder of the second degree only.

In support of this assignment counsel relies particularly on *Ingles v. People,* 92 Colo. 518, 22 P. (2d) 1109. Our statute provides that if one of the defenses interposed by one charged with a criminal offense be insanity, said defense must be pleaded orally as a specification to the plea of not guilty. The question there posed was whether evidence of insanity offered, not for the purpose of defense, but for the purpose of mitigation only, was within the restriction of the statute, and we held that where a defendant chooses not to interpose a plea of not guilty by reason of insanity, but to stand upon the general plea of not guilty, he may not claim irresponsibility by reason of insanity and demand an acquittal on that ground, but that he is entitled to introduce evidence of insanity or mental derangement short of insanity, for the purpose, not of seeking an acquittal, but of reducing the grade of the crime from murder of the first degree to murder of the second degree.

In the present case, it could hardly be otherwise than that the jury found defendant guilty of murder of the first degree because the murder was committed in the perpetration of robbery. Defendant stated in his confession that after he shot Randolph, he "took the dough out of his pocket"; that he kept the money, and that there was $450.00; and there was no evidence be-

fore the jury to the contrary. But even assuming the jury found that defendant's motive was not robbery, but revenge for Randolph's having beaten him, as he said, out of some money in a bootlegging deal in 1937, still a different question is involved from that in the Ingles case. Here insanity was pleaded as a defense and the question is whether, when insanity is so pleaded, evidence of insanity should be considered by the jury both in defense and in mitigation; whether, if the jury finds defendant not so insane as to be entitled to acquittal, it may still find him so insane as to be guilty only of murder of the second degree. The weight of authority is to the contrary. In California the rule has been stated as follows: "The insanity of a defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree. If responsible at all in this respect, he is responsible in the same degree as a sane man, and if he is not responsible at all he is entitled to an acquittal in both degrees." *People v. Troche,* 206 Cal. 35, 273 Pac. 762, 772.

Like rule has been stated and followed in: *State v. Maioni,* 78 N.J.L. 339, 74 Atl. 526; *Sage v. State,* 91 Ind. 141; *United States v. Lee,* 4 Mackey 489; *State v. Kotovsky,* 11 Mo. App. 584; *Commonwealth v. Hollinger,* 190 Pa. 155, 42 Atl. 548; *Hogue v. State,* 65 Tex. Cr. 539, 146 S.W. 905; *Foster v. State,* 37 Ariz. 281, 294 Pac. 268; *State v. Fisko,* 58 Nev. 65, 70 P. (2d) 1113. And it is stated in 1 Michie on Homicide, p. 199, §61; Wharton on Homicide (3d ed.), p. 803, §539; Glueck, Mental Disorder and the Criminal Law, 200; 76 Am. S.R., p. 84.

Yet several states have recognized limitations to this rule. In *Andersen v. State,* 43 Conn. 514, where defendant, without substantial grievance, appeared at the shop in which he had formerly been employed, and with a revolver in each hand started shooting promiscuously, killing a man with whom he had had no trouble, and there was much evidence as to his irrational excitability and suffering from fancied injuries, the court said: "It

is not our purpose either to ignore or recognize this form of insanity as an excuse for crime. The question is not whether an act committed under its influence is criminal; whether the actor should be punished or be exempt from punishment; but whether he is a proper subject of capital punishment. If it be conceded that one afflicted with it never loses the power to distinguish between right and wrong, and is at all times master of himself and may control his actions, still his mind may be enfeebled and the power of his will weakened, so that he will readily yield to the influence of temptation or provocation without that wilful, deliberate and premeditated malice which is essential to constitute murder in the first degree."

In *Dejarnette v. Commonwealth*, 75 Va. 867, 880, is recognition of the rule by way of dictum: "At the same time, there are, doubtless, cases in which, whilst the prisoner may not be insane, in the sense which exempts from punishment, yet he may be in that condition from partial aberration or enfeeblement of intellect which renders him incapable of the sedate, deliberate and specific intent necessary to constitute murder in the first degree. These are questions for the jury, and not for the court."

In *People v. Moran*, 249 N.Y. 179, 163 N.E. 553, an epileptic youth, of low and unstable mentally, classed as a psychological inferior, and with a record of insanity in both paternal and maternal lines, had been convicted of murder of the first degree. The court of appeals said: "Feebleness of mind or will, even though not so extreme as to justify a finding that the defendant is irresponsible, may properly be considered by the triers of the facts in determining whether a homicide has been committed with a deliberate and premeditated design to kill, and may thus be effective to reduce the grade of the offense." However, the conviction was affirmed.

More recently in *State v. Green*, 78 Utah 580, 6 P. (2d) 177, a twenty-one year old youth was convicted of

murder of the first degree. He had low mentality, was afflicted with toxic goiter, and both his father and sister had been hospitalized as insane. Following a slight disagreement, his wife had gone to her mother's home. After having retired at night defendant arose, dressed, announced he would be back in a few minutes, procured a revolver, drove out to the home of his wife's mother, roused the family from sleep and killed his wife, her mother, and her stepfather. A member of the household testified that before the shooting, defendant was white, his eyes were wild and he was nervous and trembling. The conviction was reversed on appeal for error in several respects, and the court said: "Not all persons who are afflicted with insanity, lunacy, idiocy, or other unsoundness of mind are to be exonerated from punishment for their criminal acts merely because of such afflictions. Insanity may be a complete defense to a criminal act, it may reduce the degree of the offense where the crime is divided into degrees and where a particular intent is a necessary element of the greater degree, and it may neither excuse nor mitigate the offense. Insanity is effective in warding off or reducing punishment for crime only when it renders the person so afflicted irresponsible or partly irresponsible."

In attempting to find a common thread of reason in these cases we reach the conclusion that the basis of admissibility of evidence as to insanity on the issue of the degree of homicide is not dependent on its relevancy to insanity as such, but rather on its relevancy to wilfulness and deliberation in the killing. The question to be determined is not whether defendant was insane, but whether the homicidal act was committed with deliberation and premeditation. The evidence offered as to insanity may or may not be relevant to that issue. The rule seems to be well expressed in 26 American Jurisprudence, page 228, section 105: "The doctrine has been advanced by some textwriters that partial insanity may be a mitigating element in determining the degree of

the crime of which the accused may be convicted. But the general rule appears to be that insanity, when interposed as a defense in a criminal prosecution, is either a complete defense or none at all. A claim of insanity cannot be used for the purpose of reducing a crime of murder in the first degree to murder in the second degree or from murder to manslaughter. If the perpetrator is responsible at all in this respect, he is responsible in the same degree as a sane man; and if he is not responsible at all, he is entitled to acquittal in both degrees. However, evidence of insanity, or rather, *evidence of the condition of the mind* of the accused at the time of the crime, together with the surrounding circumstances, may be introduced, not for the purpose of establishing insanity, but to prove that the situation was such that a specific intent was not entertained — that is, *to show absence of any deliberate or premeditated design."*

So in *Andersen v. State, supra,* the evidence of the condition of the mind of the defendant—of his excitability, his suffering from fancied injuries, of his imagining that his fellow workmen had poisoned the water he drank and had conspired against him and were trying to kill him, was admissible, not because it was evidence of insanity, but because it was relevant to the issue of deliberation necessary to constitute murder of the first degree. So, also, in *People v. Moran, supra,* the epilepsy, the low and unstable mentality, and the insanity in the family were relevant to the issue of capacity for deliberate and premeditated design to kill, and in *State v. Green, supra,* like relevancy appears.

Applying that principle to the instant case we find that here there was no evidence of defendant suddenly going berserk as in the Andersen case, no evidence of mental weakness as in the Moran case, no evidence of burst of passion with paleness, wild eyes and trembling as in the Green case. Here the tendered evidence as to insanity had no relevancy whatever to the issue of degree of homicide. As was said in *Spencer v. State,* 69 Md.

28, 42, 13 Atl. 809, following reference to *Hopt v. People,* 104 U.S. 631, where similar rule was declared in case of drunkeness: "The principle of those cases may be conceded. But how does such principle apply to this case, where it is shown by all the evidence, that of the prisoner included, that there was the most deliberate premeditation in the perpetration of the crime? That the victim of the crime was actually decoyed from his house to the place of the murder, and there, while defenseless, was admonished of the deadly purpose of his murderer, and then shot to death without resistance."

So in the instant case, the long held purpose, the deliberate and calculated plan, the cold-blooded execution and careful attempts at concealment, are unchallenged in the record and are admitted by the defendant in his confession. Here, then, if defendant was guilty at all, he was guilty of murder of the first degree.

██ ██ Whether or not there is any evidence tending to reduce the grade of homicide is a question of law for the court. *Smith v. People,* 1 Colo. 121; *Dickens v. People,* 67 Colo. 409, 186 Pac. 277; *Jones v. People,* 93 Colo. 282, 26 P. (2d) 103; *Reppin v. People,* 95 Colo. 192, 34 P. (2d) 71; *State v. Green, supra.* Where, as here, there is abundant evidence that the crime was deliberate, and there is no evidence indicating to the contrary, refusal of the trial court to instruct on murder of the second degree was not error.

██ Error is next urged in the instruction given on insanity as follows: "On the subject of insanity, the court instructs you as follows: A person who is so diseased in mind at the time of the act as to be incapable of distinguishing right from wrong with respect to that act, or being able to so distinguish, has suffered such an impairment of mind by disease as to destroy the will power and render him incapable of choosing the right and refraining from doing the wrong, is not accountable; and this is true howsoever such insanity may be manifested, whether by irresistible impulse or otherwise. But

care should be taken not to confuse such mental disease with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred or other motives, and kindred evil conditions, for where the act is induced by any of these causes the person is accountable to the law."

It is contended that there is fallacy in the last sentence of the quoted instruction, in that insane persons have passion growing out of anger, revenge, hatred or other motives, even more accentuated than sane persons, and that the prime motivating force of a legally insane paranoiac may be to satiate his revenge, hatred or anger. Even so, the instruction was not error. In the case of the paranoiac or other person so diseased in mind as to be incapable of distinguishing right from wrong with respect to his act or incapable of choosing the right and refraining from the wrong, the act is induced by passion growing out of his mental disease and not by passion growing out of anger or other motive. The instruction here complained of is in language identical with that quoted as instruction number 7 in *Shank v. People,* 79 Colo. 576, 247 Pac. 559; and of like import to instruction number 7 given and approved in *State v. Paulsgrove,* 203 Mo. 193, 101 S.W. 27, and is a proper statement of the law as applicable to the facts presented in the instant case.

■ Again, error is urged in the refusal of the court to require the district attorney to submit to defendant's counsel for inspection, written statements made by Miller, the chief witness for the prosecution. Miller admitted on cross-examination that he had made a signed statement to the Omaha police and later another to the officers in Denver. A subpoena duces tecum had been served upon the district attorney to produce them and after Miller's admission of making the two statements, demand was made of the district attorney for their production for use in impeachment of Miller on his further cross-examination. This was refused. It was particularly charged by defendant's counsel that in these statements

Miller admitted that he, and not Battalino, took Randolph's money after the shooting. However, the witness denied any such admission.

The granting or refusal of the accused's request for inspection of written statements of a witness for the prosecution has been held to lie in the discretion of the trial court. *State v. Hayes,* 127 Conn. 543; 18 A. (2d) 895; *Boehm v. United States,* 123 F. (2d) 791. Where it appears that such statement is in possession of the prosecuting attorney and is contradictory to the testimony of the witness and its publication would not be prejudicial to the public interest, request of the accused for its inspection for the purpose of impeachment of the witness on cross-examination has generally been held proper and its refusal in some cases reversible error. *United States v. Krulewitch,* 145 F. (2d) 76, 156 A.L.R. 337, with helpful annotation; *People v. Walsh,* 262 N.Y. 140, 186 N.E. 422. The reason was well stated by Cooley, C. J. in *People v. Davis,* 52 Mich. 569, 18 N.W. 362, as follows: "The state has no interest in interposing any obstacle to the disclosure of the facts, unless it is interested in convicting accused parties on the testimony of untrustworthy persons. But surely the state has no such interest; its interest is that accused parties shall be acquitted unless upon all the facts they are seen to be guilty; and if there shall be in the possession of any of its officers information that can legitimately tend to overthrow the case made for the prosecution, or to show that it is unworthy of credence, the defense should be given the benefit of it."

There are cases holding to the contrary. *Chandler v. State,* 60 Tex. Cr. 329, 131 S.W. 598; *State v. Rhoads,* 81 Ohio St. 397, 91 N.E. 186; 27 L.R.A. (NS) 558.

However, while the prosecution should interpose no obstacle to the disclosure of facts, it is not required to procure evidence for the benefit of the accused, which he is not shown to be unable to obtain by customary procedure. Neither of the statements here involved was

taken by the prosecuting attorney or in his presence or at his behest or by officers under his control. One was taken by officers in another state and the district attorney testified that he had never seen it nor even a copy of it, and did not know what was in it. The second statement was taken by the police of another county in another district, outside the authority of the district attorney. Had the district attorney been in possession of either statement, or had they been under his control, a different question would have been presented. The copy which he had in his possession could not have been verified by him. It was not competent evidence of whatever statements it may have contained; it could not have been used for impeachment of the witness, and apparently no attempt was made by defendant's counsel to procure the original by subpoena of the Denver officers or otherwise. Refusal to permit inspection of such copies has been held proper. *State v. Brake,* 99 Ore. 310, 195 Pac. 583; *People v. Glaze,* 139 Cal. 154, 72 Pac. 965; *Vaughn v. State,* 25 Ala. App. 204, 143 So. 211.

Furthermore, the testimony of Miller was not the sole or principal evidence supporting Battalino's conviction, but was merely corroborative of his written confession. Battalino admitted in that confession that he took the money from Randolph's pocket and in every substantial respect the testimony of Miller coincided with the confession of Battalino. From the testimony of the expert witnesses on insanity it appears that Battalino told them, when being questioned for the purpose of ascertaining his sanity, that Miller, and not he, took the money from Randolph's person. Such testimony, however, cannot be considered as in evidence before the jury on the issue of the guilt or innocence of the defendant. As to that issue it was hearsay and self serving. It was admissible only as constituting part of the basis of the opinion of the expert witness as to insanity.

Where the written statement of a witness is not used to refresh his recollection and is unsigned and not ad-

missible for impeachment, it is not error to refuse submission of the statement for the purpose of impeaching testimony of the witness which merely corroborates what defendant has already admitted.

■ ■ Finally, error is assigned to the refusal of the court to require Dr. Bush, an expert witness for the prosecution, to submit to defendant the notes, memoranda, data and stenographic reports pertaining to matters upon which he predicated his opinion concerning the sanity of the defendant.

On cross-examination this witness testified in effect that he based his testimony upon physical and neurological examinations and upon interviews with the defendant, and that part of the questions and answers at the interviews were recorded by a stenographer. There was no evidence that such questions and answers or any other memoranda were used by the witness to refresh his memory either while on the stand or prior to the time of giving testimony. He was fully interrogated as to the nature and extent of the examinations made, and the substance of defendant's statements made at the interviews. It was not error to refuse defendant's counsel the right of inspection of such memoranda. "Before the witness can be required to produce a paper, however, it must appear that he is using it as, or in aid of, his testimony. No lawyer would claim to be entitled to an inspection of every paper the witness might have in his custody, or even in his hand, while giving evidence." *Tibbetts v. Sternberg,* 66 Barb. 201. "If a witness can testify to facts absolutely from his recollection, he need not, it seems, necessarily produce in court a memorandum by which his memory, in respect to the facts, has been revived." *Peck v. Lake,* 3 Lans. 136. See, *State v. Magers,* 36 Ore. 38, 58 Pac. 892; *Williams v. Duluth St. Ry. Co.,* 169 Wis. 261, 171 N.W. 939; *Bess v. Bess,* 58 Ida. 259, 72 P. (2d) 285; and annotation, "Refreshing Recollection of Witness." 125 A.L.R. 203, et seq. The fact that the matters testified to by the witness were received, not as

being true but as being the basis of his opinion, should not change this rule.

Defendant was diligently and capably represented by experienced counsel appointed in his behalf both in the trial court and on review here. His rights were fully safeguarded, and a careful review of the entire record convinces us that there is no substantial error therein. The judgment of the trial court is affirmed and it is ordered that it be executed during the week commencing January 2, 1949.

MR. JUSTICE LUXFORD not participating.

MR. JUSTICE HILLIARD dissents.