## WILL GARRETT v. THE STATE.

### No. 3797.  Decided December 11, 1907.

**1.—Murder—Capital Case—Insufficiency of Evidence.**

Where upon trial for murder the theory of the State was an intentional killing of deceased, and that of the defense that defendant thought he was killing his rival who had come to destroy his life; and the evidence indicated a want of premeditation and deliberation on the part of the defendant to take the life of the deceased, a verdict assessing the death penalty for murder in the first degree was not warranted.

**2.—Same—Evidence—Threats.**

Upon trial for murder where the supposed threat was not shown to have been made against the deceased, and that defendant simply threatened to kill a "guinea," an appellation sometimes applied to negro women generally, the meaning of which was not understood by the witness, the same was inadmissible.

**3.—Same—Evidence—Practice in District Court—Confession—Warning—Withdrawal of Testimony Illegally Admitted.**

Where upon trial for murder the evidence of both parties had been closed and State's counsel had begun his address to the jury when the court adjourned for recess, and upon resuming, the court was informed by defendant's counsel of newly discovered testimony which contradicted one of the State's witnesses with reference to the warning given defendant before making his confession, which the court refused to admit, saying that he would control the matter, and after the close of the State's counsel's argument withdrew the testimony of said State's witness after it had been thoroughly discussed by State's counsel. Held reversible error.

**4.—Same—Argument of Counsel.**

Where upon trial for murder, defendant's counsel in discussing the evidence drew his conclusions that another party than defendant might have been with the deceased on the night of the homicide, saying that from this the rumor had gotten out that a man and woman had been killed, when he was interrupted by State's counsel who said that as a matter of fact there was a negro man killed in the city that night in another place. Held, reversible error.

**5.—Same—Evidence—Leading Questions.**

Where upon trial for murder, the State's attorney was permitted to place his questions in a leading form for evidence he sought to elicit from the witness, and the court promised he would sustain objections thereto yet he did not do so, but told the witness to answer, which he did, there was reversible error.

Appeal from the Criminal District Court of Dallas.  Tried below before the Hon. E. B. Muse.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*Graham B. Smedley* and *Wm. M. Jones,* for appellant.—It is error for the court to refuse to allow the defendant to introduce testimony

in rebuttal of testimony already introduced by the State and corroborative of the testimony of the defendant. Milrainey v. State, 33 Texas Crim. Rep., 577; Hewitt v. State, 10 Texas Crim. App., 501; Grosse v. State, 11 Texas Crim. App., 364; Bostick v. State, 11 Texas Crim. App., 126; King v. State, 9 Texas Crim. App., 515; McClackey v. State, 5 Texas Crim. App., 320; Muely v. State, 31 Texas Crim. Rep., 155.

It is an abuse of discretion for the court to refuse to allow the defendant to introduce testimony at any time before the close of the argument, when the testimony offered is material and important to defendant's case; and this is particularly true, when the defendant and his attorneys are not at fault in not having offered the testimony sooner. Code of Criminal Procedure, article 698; Donehoe v. State, 12 Texas Crim. App., 297; Milrainey v. State, 33 Texas Crim. Rep., 577; Bostick v. State, 11 Texas Crim. App., 126; Arrington v. State, 20 S. W. Rep., 927; Gross v. State, 11 Texas Crim. App., 364; Cook v. State, 11 Texas Crim. App., 19; Hewitt v. State, 10 Texas Crim. App., 501; Bird v. State, 16 Texas Crim. App., 528.

When the defendant has offered testimony for the purpose of explaining, contradicting, or discrediting testimony already introduced by the State, and the court has erroneously refused to allow the offered testimony to go to the jury, the error of the court is not cured by the court's instruction to the jury in its charge not to consider the testimony already introduced by the State; and this is particularly true when the purpose of the offered testimony was not only to explain or contradict or discredit the testimony introduced by the State, but also to corroborate the defendant's own testimony already introduced. Barth v. State, 39 Texas Crim. Rep., 386; McCandless v. State, 42 Texas Crim. Rep., 58, 57 S. W. Rep., 672; Faulkner v. State, 43 Texas Crim. Rep., 311, 65 S. W. Rep., 1093; Williford v. State, 36 Texas Crim. Rep., 426; Richardson v. State, 9 Texas Crim. App., 612; Schwen v. State, 37 Texas Crim. Rep., 370; Welhausen v. State, 30 Texas Crim. App., 626; Tijerina v. State, 45 Texas Crim. Rep., 182, 74 S. W. Rep., 913; Sanchez v. State, 5 Texas Ct. Rep., 584; People v. Fox, 121 N. Y., 449; Code of Crim. Proc., art. 10; Code of Crim. Proc., art. 631; Code of Crim. Proc., art. 766; King v. State, 9 Texas Crim. App., 515; Muely v. State, 31 Texas Crim. Rep., 168.

It is reversible error for the State's attorney, in the presence and hearing of the jury, to make a statement of a fact pertaining to the case, not in evidence, when the fact stated is obviously calculated to prove hurtful in the case to the defendant. Jenkins v. State, 49 Texas Crim. Rep., 470, 16 Texas Ct. Rep., 129; Coleman v. State, 49 Texas Crim. Rep., 82, 14 Texas Ct. Rep., 371; Bearden v. State, 46 Texas Crim. Rep., 144, 9 Texas Ct. Rep., 813; Smith v. State, 44 Texas Crim. Rep., 137, 5 Texas Ct. Rep., 372; Rutherford v. State, 4 Texas Ct. Rep., 448; 67 S. W. Rep., 100; Nalley v. State (Texas App.), 13 S. W. Rep., 670; Tillery v. State, 24 Texas Crim. App., 251; 5 S. W. Rep., 842.

It is error for the court to allow a witness for the State, on direct ex-

amination, to answer questions, asked by the State's attorney, which are leading and suggestive of the answers desired, and which, because of their general and sweeping nature, necessarily elicit, whether truthfully or falsely, the negative answer desired. San Antonio, etc., Ry. Co. v. Hammon, 92 Texas, 509; Conn v. State, 11 Texas Crim. App., 390, 401; Happerwood v. State (Texas Crim.), 44 S. W. Rep., 841.

Where it is shown that a homicide was intentionally committed and the facts show that it was done neither with express malice nor under circumstances excusing, justifying or mitigating the act, the law in that event implies malice and the offense is murder in the second degree. Harris v. State, 8 Texas Crim. App., 90; Douglass v. State, 8 Texas Crim. App., 520; Gonzales v. State, 30 Texas Crim. App., 203.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—The evidence shows that appellant at night killed Letitia Bedford; the jury assessed the death penalty.

The facts are very voluminous and unnecessarily prolix. In substance, it is gleaned from the record that appellant was paying rent for a house occupied by himself, the deceased, and relatives of the deceased, and that she (deceased) had for some time been playing the part of mistress to him. Another negro came upon the scene as a rival for the favors of appellant's mistress. This, as usual under such circumstances, brought trouble. This rival had threatened the life of appellant. The girl had been going out at night with appellant's rival, which disconcerted appellant. On the night of the tragedy this girl came on the gallery from a nocturnal outing and was opening the door of appellant's room, which seems to have been an unusual occurrence for her, if in fact she had ever done so previously. Appellant was anticipating a dangerous visit from his rival. On the evening prior to the homicide appellant had borrowed a gun for the purpose of going hunting the following day, and bought some shells loaded with small shot; he made an appointment with another party for the hunt. Their purpose was to kill birds. Some time prior to the homicide the same night appellant had retired to his room and had gone to bed. The gun and cartridges were in his room. He testifies he had been asleep at the time the noise occurred at his front door. When the party undertook to open the door, appellant grabbed his gun and fired; the death of Letitia Bedford was the result. Appellant, in his night clothes, immediately fled, leaving his gun, cartridges, wearing apparel and everything in the room where he was sleeping. Without going into a detailed statement of the many facts and circumstances pro and con, developing the State's theory of intentional killing of the girl, and appellant's theory that he thought he was killing his rival who had come to destroy his life, and statements to the effect that he was not aware at the time of his arrest that he had killed anybody, we think the above is a sufficient statement for the disposition of the case.

However many disputed facts this record discloses, and however antagonistic the testimony is in regard to matters and conversations, threats, etc., occurring prior to the night of the homicide, it is not a disputed fact but a conceded one, that appellant had retired for the night, and at the time of the killing was in his night clothes, and fired just as the party was trying to open the door, and in this condition fled out into the darkness. The writer desires to state, at this point, that he is of the opinion that this evidence does not show a capital case. There is not sufficient evidence, in my judgment, to show that this killing occurred under circumstances that indicated premeditation and deliberation to take the life of the girl when it occurred. This record makes it apparent that appellant was not expecting deceased at that point. But be that as it may, there are some matters occurring in this record that require a reversal of the judgment.

There are quite a number of bills of exception reserved in the statement of facts and scattered along through two hundred and fifty pages of evidence, all of which we do not think necessary to review.

One of the bills of exception shows that the witness, Owens, was testifying for the State, and among other things it was sought to prove by him substantially that he overheard appellant talking with another party, in which he (appellant) made threats to kill a guinea, and that in the opinion of the witness he meant this girl, but he did not know what he meant by saying "guinea." It is shown in the record by some of the testimony that the word "guinea" mentioned referred to negro women generally. Objection was urged to this testimony. Without going into a detailed statement of it and the grounds of objection, we are of opinion that this character of threat was not admissible. This has been decided so frequently we deem it unnecessary to cite authorities. Before a threat supposed to have been made by the accused can be used against him in his trial, the evidence must show that the threat was directed against and individuates the deceased. The fact that guinea meant negro women is not sufficient.

There is a bill of exceptions in the record which recites, in substance, that after the testimony for the State and defendant had closed, and the assistant county attorney was making his opening argument to the jury and before any other argument had been made to the jury, and during an intermission of the court immediately following the close of said argument, which intermission was from 5:30 to 7 o'clock p. m., counsel for appellant discovered certain new testimony, the failure to discover which previously was not due to negligence on his (appellant's) part or on the part of his attorneys. When the court reconvened, the judge asked appellant's counsel if they were ready to proceed with the argument, and was informed that during recess they had discovered new testimony, which they desired to introduce before proceeding with their argument, and explained the nature of it privately to the court, at the request of the court. The court retired the jury, and had J. C. Coleman, one of the witnesses to the newly discovered facts, placed on the

witness stand. Appellant's confessions were testified to by Tanner, one of the officers, who stated that he and the assistant county attorney had gone to the jail where appellant was confined, and obtained certain confessions after warning. Appellant testified contradictory to Tanner in regard to the same confessions and that he was mistreated and kicked and abused in order to obtain the confession or statements, and this by the assistant county attorney, whom he further testifies was intoxicated at the time. It then became an issue before the jury whether or not these confessions were really voluntarily made after warning. Without discussing the question of warning there was a direct issue between Tanner's testimony and appellant's as to the manner of obtaining the confessions, and as to what the confessions or statements of appellant were. Appellant stated that the assistant county attorney was intoxicated and used violence upon his person to extort the confessions, and stated what he did because he was fearful of the result of the visit of the two officers to his cell, etc. If the confessions were not voluntary, although a warning had been given, they should not have been introduced in evidence, but there being an issue upon it, appellant's newly discovered testimony was offered for the purpose of sustaining his testimony as to the condition of the officers and the manner of obtaining the confession. Coleman then testified before the court that he saw the assistant county attorney on the night of the confession and just after he left the jail and heard him talking about the confessions of appellant; located the place of the conversation at Felix Tanco's bar. Getting down to a material part of the testimony of this witness, the following occurred: "Q. Did he tell you that he had gotten a confession from Will Garrett? A. Yes, sir. Q. What did he say about the negro, Will Garrett, at that time? A. He made the remark that he was the most stubborn son-of-a-bitch that he had ever seen in his life. Q. Did he say that it was difficult to get a statement and confession from him? A. He did, yes, sir. Q. Did he say that it was necessary for him to do anything? A. He said he talked with him and fussed with him and even choked him, and it took him forty minutes before he could get that negro to open his mouth. Q. Did he say he choked Will Garrett? A. He did. Q. What was his condition at the time he made this remark at the bar? A. He was drinking. Q. Was he drinking very much? A. It looked as though he was. Q. Was he about drunk? A. I think he was intoxicated; yes, sir. Q. Are you a judge of when a man is intoxicated? A. I think I should be. Q. Why do you think you should be? A. I have been tending bar for a good many years and handled a good many drunken people. Q. Have you seen a good many drunk people? A. Yes, sir; I have, a number of them. Q. Have you ever seen Mr. Nelms drinking? A. I have, yes, sir; several times. Q. Have you seen him sober? A. I have, yes, sir. Q. Do you think you could tell the difference in Mr. Nelms when he was drinking and when he was sober? A. I think I could tell the difference. Q. At the bar that night did he indicate that he was

drinking? A. He indicated that he was drinking, yes, sir. Q. By what? A. By his talk. Q. Did he stagger or anything of that kind? A. Why, yes, he was staggering a little." The following part of the testimony of this witness goes on to elucidate and amplify these questions. It is also agreed that the testimony of Felix Tanco would be practically the same as Coleman in regard to this matter, and it is made to appear this is entirely newly discovered testimony. This evidence should have gone to the jury. Tanner had testified that Mr. Nelms was not intoxicated; appellant had testified that he was, and to the treatment. There was a square issue between these two witnesses, appellant and Tanner, in regard to these matters. The evidence of the outside witnesses as to the condition of Mr. Nelms immediately succeeding this visit to the jail was pertinent testimony in regard to the manner of obtaining this confession; at least, as to the condition of Mr. Nelms immediately succeeding what transpired at the jail. It is just to state that Mr. Nelms did not object to the introduction of this testimony before the jury; stated his entire willingness to let it go before the jury and himself desired to take the witness stand to meet it. The court ruled it out of his own volition. This was error. In ruling it out the court stated that he would control it in his charge to the jury. It would be a very difficult matter to control evidence to the jury that had not been introduced, for the jury was supposed to know nothing about it; the jury had been retired from the courtroom and did not hear it. Appellant was seeking to get it before the jury, but the court undertook to solve all questions connected with this matter by withdrawing Tanner's testimony from the jury in his written charge. Perhaps the withdrawal of Tanner's testimony in regard to these confessions, in the manner and at the time it was done, was more injurious than if it had remained before the jury contradicted to a certain extent by appellant's evidence, for the record discloses that the court did not inform the jury that they should not consider this testimony until after the arguments had been concluded and did so then in the general charge. The county attorney had argued this question in his opening argument. Coleman and Tanco's testimony was sought to meet this as far as possible immediately upon it being discovered. It was rejected and Tanner's testimony remained before the jury the remainder of the discussion by counsel. Then, after it had been fully discussed, the court informed the jury that they should not consider his testimony. We are of opinion this matter is placed in such relation that it is more injurious to appellant than if Tanner's evidence had remained properly guarded by an appropriate charge. A great many authorities have been cited by appellant in his brief in support of his contention, but we deem it unnecessary to cite them. The most injurious course to appellant was followed in this whole matter.

Another bill recites that while one of appellant's attorneys was addressing the jury he said that "Will Garrett had testified that while he was on his way to Buckner's Orphans Home he had met a man with a

bottle and that the man had told him they are raising hell in Dallas; there was a man and woman killed there last night," and defendant's counsel further said to the jury that "he believed from that that the rumor had gotten out that a man and woman had been killed here in Dallas, and that the rumor was to the effect that Joe Smith and Letitia Bedford had been killed, and that he believed that this indicated in an indirect way that Joe Smith was with Letitia Bedford that night." Thereupon the assistant county attorney interrupted counsel for defendant and stated, "As a matter of fact there was a negro man killed in Dallas that night in another place." Objection was urged to this. This ought not to have been permitted. No witness would have been permitted to testify as against appellant that in another part of the city on that night another man had been killed.

Another bill was reserved to the manner of asking certain questions, because they were leading, suggestive and prejudicial, etc. Tanner was placed on the stand by the State to prove confessions of appellant while in jail. The following occurred: "Q. Mr. Tanner, do you remember the occasion of Letitia Bedford being killed? A. Yes, sir. Q. Did you make any effort to locate the defendant after that killing? A. Yes, sir; our department did. Q. Your whole department was after him? A. Yes, sir. Q. Do you remember the occasion of his being arrested and being brought to Dallas? A. I do. Q. Do you remember the night he was brought here? A. Yes, sir. Q. Did you see him that night? A. Yes, sir. Q. Who was with you at the time you saw him? A. Yourself. Q. Where did you meet me or where did I meet you that night? A. At the city hall. Q. What if anything did I say to you in reference to this negro? A. Asked me to go to the jail with you, that you wanted to talk with this negro and see what he had to say about this killing. Q. At that time was I drunk, drinking, intoxicated, or in any degree under the influence of liquor? A. None whatever. Q. Did I have a bottle of whisky with me? A. Never did show it if you did. I never did see any whisky. Q. During the conversation with the defendant did I at any time offer him whisky or try to get him to drink whisky? A. You did not. Q. Did I at any time curse, abuse or threaten the defendant? A. You did not. Q. Did I at any time kick or strike the defendant? A. You did not. Q. Is it not a fact, Mr. Tanner, that the defendant told us after being duly warned by me on the night of this shooting, Joe Smith, a negro barber, came into his room? Mr. Hamilton: We object. Mr. Nelms: And presented a six shooter to him? Mr. Hamilton: Wait a minute. Mr. Nelms: No; I won't wait. Court: Let him ask the question. Mr. Hamilton: We object and say the question is leading. Mr. Nelms: And presented a pistol to him and told him God damn you, get up from there and pull your freight, or I will blow your damned brains out? Mr. Hamilton: Don't answer that, we object. Mr. Nelms: I am not through. The Court: Go ahead. Mr. Nelms: And that thereupon he jumped up from the bed and grabbed a shot gun? Mr. Hamilton:

Wait just a minute, we want to except. Mr. Nelms: I won't wait. The Court: Now what is your objection? Mr. Smedley: We object to it because the question is leading. The Court: The court will sustain your objection and let Mr. Tanner tell what was said." Then appellant objected substantially that it was error to permit the attorney to place his questions in a leading form for evidence he sought to elicit from the witness, and that they were suggestive and intended to suggest the answer, and for the reason the county attorney by his questions indicated to the witness, the line of answers that he desired and indicated and suggested in advance testimony which was hurtful and injurious. We are of opinion that this bill of exceptions is well taken. These questions were as leading and suggestive as it was possible for them to be framed, and under all the authorities, as far as we are aware, this testimony was clearly inadmissible. See Ripley v. State, 51 Texas Crim. Rep., 126, 100 S. W. Rep., 943; Davis v. State, 43 Texas, 190; Wright v. State, 10 Texas Crim. App., 480; Rangel v. State, 22 Texas Crim. App., 642; Ashlock v. State, 16 Texas Crim. App., 13; Railway v. Hammon, 92 Texas, 509; Railway v. Dalwigh, 92 Texas, 655; Bridge Co. v. Cartrett, 75 Texas, 628; Lentz v. Dallas, 96 Texas, 258; Able v. Sparks, 6 Texas, 349; Railway Co. v. Duelin, 86 Texas, 450; Conn v. State, 11 Texas Crim. App., 390; Hopperwood v. State, 39 Texas Crim. Rep., 15, and Craddick v. State, 13 Texas Ct. Rep., 637. While the court said he would sustain the objection, he yet told the witness to answer and he did answer.

There are other bills of execption in the record that we have thought perhaps unnecessary to discuss.

For the reasons indicated, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Henderson, Judge, absent.