### Henry John Toussaint v. The State.

No. 6625. Decided October 18, 1922.

**1.—Murder—Insanity—Motion For New Trial—Newly Discovered Evidence.**

Where, upon trial of murder inflicting the death penalty, the defendant relied for defense upon insanity, and after verdict filed a motion for new trial, upon the ground of newly discovered evidence but did not bring himself within the rule required for newly discovered evidence, there was no error in overruling his motion for new trial.

**2.—Same—Argument of Counsel—Insanity—Opening and Closing Argument.**

The State's counsel is accorded the privilege of opening and concluding the argument, in a criminal case tried on the issue of not guilty, and Article 1020, C. C. P., giving to the accused such right, does not relate to a trial where the issue of guilt or innocence is involved, but only to a trial of the issue of insanity after verdict is given.

**3.—Same—Charge of Court—Insanity—Requested Charge.**

Where the court submitted the issue of insanity, and adopted the language embraced in defendant's requested charge, there was no error in the refusal of defendant's other charge on the same subject.

**4.—Same—Separation of Jury—Misconduct of Jury—Burden of Proof.**

Where it was conclusively shown that the statutes with reference to preventing the jury to separate, or have conversation or personal contact with other persons, were violated, the burden was upon the State to meet the presumption of injury by the introduction of such testimony as was available to it, and in the absence of so doing, the rule illustrated by the unbroken line of precedents must operate against the verdict, and in the instant case the judgment must be reversed and the cause remanded.

Appeal from the District Court of Wichita. Tried below before the Honorable H. F. Weldon.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Bullington, Boone, Humphrey & Hoffman,* and *McDonald & Cummings* for appellant.—On question of opening and concluding argument, see Harris v. State, 172 S. W. Rep., 975.

On question of newly-discovered evidence; Schuessler -v. State, 19 Texas Crim. App., 472; Hill v. State, 53 S. W. Rep., 845.

On question of misconduct of jury: DeFriend v. State, 2 S. W. Rep., 641; Cockrel v. State, 211 id., 939; Gilbert v. State, 215 id., 106.

*R. G. Storey,* Assistant Attorney General, for the State.

MORROW, Presiding Judge.—The judgment condemns appellant to suffer death for the offense of murder.

The deceased and appellant were father and son. They were partners in business and lived together in the same bachelor's quarters.

Appellant, who was thirty-three years of age, formed the design to kill his father and purchased a pistol for that purpose. The father went in his automobile to spend the evening at the home of a neighbor, and while there, appellant secretly disconnected and removed some of the wiring in the automobile to prevent its use, secreted himself so that when his father would walk home, he might be intercepted and killed. This appellant did, shooting deceased with a pistol, afterwards rifling his pockets and taking therefrom a watch. He hid the watch and pistol, went to his home and spent the night, and pro-

ceeded with the conduct of his business affairs on the next day. He first disclaimed any knowledge of the assassination, but later admitted that it was his act, describing in detail his manner of doing it, disclosed the locality of the hidden weapon and watch, and gave as a reason for the homicide that his father's peculiar ways thwarted his ambition; that he believed the responsibility for his mother's death rested upon his father; that the deceased had threatened to disinherit him and demanded that he give up his wife; that he had complied with the demands, but felt that he was wronged and that the accumulated property would go to his brother, and due to the acts of his father, he determined to dispose of him. The State introduced a number of witness who testified to facts corroborative of the confession.

Insanity was relied upon as a defense. In the preliminary statement, counsel for the appellant reviewed his life from infancy, averring that he was born in the slums of the city of Washington, and came as an unwelcome visitor; that reared in such surroundings his childhood was sad and melancholy and his habits secluded; that in early manhood he had done many extraordinary things such as jumping into the Potomac River from a bridge seventy-five feet high, having his hands and feet tied; that he worked his way through school, acquiring a university education and took a post-graduate course in Harvard University as a civil engineer; that he traveled much pursuing his profession in various localties; that he was at the time of the offense permanently insane and would remain so the balance of his life; that his insanity was hereditary, and that those affected with his form of malady would often kill. A number of witnesses were introduced upon this issue both by the State and the appellant. Some of them were experts and some not experts. It would be profitless to quote their testimony or discuss it in detail. Suffice it to say that upon the issue of insanity there was a radical conflict such as would have justified a solution either for or against the appellant. It presented a purely jury question and reveals nothing that would warrant a disturbance by this court of the finding in favor of the State. Appellant founded his motion for new trial in part upon newly discovered evidence. Several non-expert witnesses residing in Wichita Falls were named in the motion, and in addition thereto, the affidavit of Dr. George F. Powell was appended. In this affidavit, after detailing the incidents of his examination of appellant, he said:

"The one outstanding feature of his case is his failure to comprehend the enormity of his act, or that he has violated any law of the State, society or God. He, seemingly, does not understand why he should be convicted or be made to suffer any punishment of any kind on account of his father's death, which he thinks was a laudable act.

From the foregoing I do not believe him to be a normal or sane man, or wholly mentally responsible for his acts. It is a form of mental

disorder known as paranoia. It is hereditary in most cases, and is incurable."

Some six months intervened between the filing of the indictment and the trial of the case. Appellant and his father had been residents of the city of Wichita Falls for several years immediately preceding the tragedy, and their business activities brought them in touch with many people of the city. While the attorneys representing the appellant were appointed by the court without funds, save that which they individually advanced, the record reveals that their diligence brought to the trial many witnesses both in person and by deposition, the only non-resident witness named in the motion for new trial being Doctor Powell, a physician of distinction and head of one of the State institutions situated in a neighboring city. His reputation in mental disorders was not unknown. The non-expert witnesses would have testified, in the main, to trivial acts upon the part of appellant upon which they predicated their opinion of his want of sanity. Viewed in the light of the precedents which control this court in reviewing the action of the trial court in overruling the motion for new trial, and taking into account that there is some laxity in cases where the defense is insanity, we are constrained to believe that in overruling the motion for new trial upon the ground of newly discovered evidence, the trial court did not abuse its discretion. Particularly is this true as no effort was made, as shown by the record, to procure a postponement of the trial in order to make better preparation for it. It is manifest from the record that Doctor Powell's testimony, had it been sought, might have been available at the trial. The record impresses us that the parties in charge of the defense were not ignorant of the fact that Doctor Powell could be induced to make the examination, and that if favorable to the appellant, it would be of value to him upon the issue of insanity.

There was, in our opinion, no error in the court's refusing to permit the appellant's attorneys to open and conclude the argument.

The statute, Article 724, Code of Criminal Procedure accords to the State's counsel the privilege of opening and concluding the argument in a criminal case tried on the issue of not guilty, and Article 1020, Code of Criminal Procedure, giving to the accused such right does not relate to a trial where the issue of guilt or innocence is involved, but only to a trial of the issue of insanity after verdict of guilty.

In submitting to the jury the issue of insanity, the court adopted the language embraced in appellant's Special Charge No. 1, and having done so, the refusal of appellant's Special Charge No. 2, on the same subject was proper.

Separation, prohibited conversations, and misconduct of the jury are charged in the motion for new trial, also that a prejudiced juror sat in the case after claiming on his *void dire* that he was impartial. The officer who had charge of the jury, describing his experiences

with the jurors after they were impaneled and sworn, related in substance that two members of the jury had stepped out of the window on to the fire-escape and engaged in conversation, on several occasions, with two women who were prisoners. At the time this was done, the other members of the jury were at a point some fifty feet distant engaged in a game; that the wall of the court house was between them and the two jurors who were conversing with the women, and it affirmatively appears from other testimony that the conversation which took place was not heard by the other members of the jury nor by the officer in charge. This transaction was described by the wife of the sheriff and by one of the jurors who engaged in the conversation. This juror affirmed that the conversations had taken place as described by the officer; that at the time of the conversations neither the officer nor the judge was present, and that he had not received the consent of either the court or the attorneys. He said, however, that in neither of the conversations was anything said concerning the case on trial. The fire-escape upon which he stood at the time of the conversation was connected by a stairway with the ground. The women, we gather from the record, were prisoners and were of questionable. character.

Another transaction described by the officer is that while the jurors were resting upon the court-house lawn, one of them engaged in a game of ball with his little boy, and in chasing the ball went some 150 or 200 feet away from the other jurors, the street at the time being crowded with people. While this episode is admitted by the juror in question, he controverts the testimony showing the space between him and the other jurors.

Another incident reveals that while the jury was on the street returning from one of their meals, the officer's attention was drawn to the fact that one of them was absent and he was found by the officer some thirty feet away from his fellow-jurors engaged in a conversation with his wife. The officer heard nothing that was said between the parties. There is evidence that the other jurors engaged in conversations with other persons without the consent of the court or the parties and not in the presence of either the judge or the officer. In fact, it seems that during the trial, which lasted for several days, it was a common practice among the jurors to engage in telephone conversations with parties outside. Upon the hearing of the motion for new trial these jurors testified that the conversations were with members of their family and that they had no relation to the case on trial. None of the persons to whom the jurors talked were placed upon the witness-stand.

It is charged that a juror, prior to the trial, had expressed the opinion that the appellant ought to be hung whether he was crazy or not, and that after giving such expression he qualified as an unprejudiced juror on his *voir dire*. This was controverted to a degree. The juror testified that he had no recollection of so stating.

On being cross-examined, he said that he was not drunk, but was under the influence of intoxicants. He said in the presence of Mr. Goodfellow and others, who had been talking: "Yes, they ought to hang him, they ought to take him out and hang him to a telephone post;" that this was said in a jocular manner and that he did not know they were talking about the appellant's case, and that he intended no reference to the appellant. Goodfellow, describing the matter, said that the juror entered the building showing evidence of having been drinking. Quoting the witness, he said: ."He, the juror, at that time made a statement concerning the Toussaint case. We were talking of various murder cases, and the juror came in and sat down by me and just crossed his leg and said: 'I tell you what we had better do, I think it would be best for us to take him out and hang him to a telephone pole.' I said, 'No, I don't believe in that kind of law, but I believe he ought to be hung.' I was talking about Toussaint. He said, 'What say you, let's go and take him out and hang him to a telephone post.'" In view of the conflicting evidence, the decision of the trial judge in favor of the impartiality of the juror should prevail.

In the Bill of Rights it is stated: "The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency." Art. 1, Sec. 15, of the Const. Obeying this provision of the Constitution, the Legislature has enacted several statutes. In one of them it is said: "No person shall be permitted to converse with a juror after he has been impaneled, except in the presence of and by permission of the court," and a violation of this article is made contempt and punishable by fine. Arts. 748-749, Code of Crim. Proc. It is also provided that in a felony case, "a new trial shall be granted where a member of the jury after he is impaneled has a conversation with any person in regard to the case." Art. 837, subdivision 7, C. C. P. It is declared in subdivision 8 of the same article that a new trial should be granted where the jury is guilty of misconduct such as prevents a fair and impartial trial.

Separation of the jury after it has been sworn and impaneled is prohibited save when the jurors separating are in charge of an officer and this only is permitted when the court gives express permission and the parties consent. These statutes have been uniformly construed mandatory. Mauney v. State, 85 Texas Crim. Rep., 184; Gilbert v. State, 215 S. W. Rep., 106 Cochrell v. State, 85 Texas Crim. Rep., 326 Newman v. State, 91 Texas Crim. Rep., 559 Early v. State, 51 S. W. Rep., 391, 123 Am. St. Rep., 889; Parshall v. State, 62 Texas Crim. Rep., 177; Loan v. State, 66 Texas Crim. Rep., 512; Wood v. State 84 Texas Crim. Rep., 191; McDougal v. State, 81 Texas Crim. Rep., 191; Mitchell v. State, 36 Texas Crim. Rep., 318; Campbell v. State 37 Texas Crim. Rep., 617; McWilliams v. State, 32 Texas Crim.

Rep., 269; Dibbles v. State, 89 Texas Crim. Rep., 427, 231 S. W. Rep., 768.

In applying them the rule followed is that where the evidence shows a violation of the express command of the statute, the presumption of injury is indulged and a new trial must be granted, unless the presumption is overcome by evidence. As applied to communications over the telephone, this court said:

"Heretofore, we have held with reference to the separation of jurors that these would be liable if tampered with to suppress the fact and that, therefore, little reliance should be placed on their testimony, and the same rule would apply with reference to conversations. So that the necessity for the examination of others, than the jurors with whom such conversations may have occurred seems to be necessary. This was not done. We accordingly hold that the burden thus shifted to the State was not discharged by it. We believe in the face of the statutes above cited that it would be a bad precedent to hold that jurors out of the presence of the court, and not by permission of the court, should be permitted to converse with other persons over phones, and certainly where such conduct does occur it should be held obligatory on the State to show beyond any question that the jurors were not tampered with. Any other rule would destroy a barrier set up by the Legislature intended to protect the purity and integrity of the jury box." (Early v. State, 51 Texas Crim. Rep., 391.)

The reason for the rule is found in the interest which the public has in preserving the purity of trial by jury, thereby to protect the rights both of the State and the accused. Upon the purity and impartiality of the jury rests the entire structure of our criminal law. As said by Judge Davidson, the application of the rule, as was done in the Early case and many that follow it, does not imply any aspersion upon the honesty of jurors in any particular case, but it is to guard against the evil that would follow the impaneling of a dishonest or prejudiced juror. Such a juror being guilty of conduct violative of the Statutory provisions mentioned, would be the last to reveal it. If a juror during his retirement desires to hold an innocent conversation with one outside, it is no insurmountable hardship to require that he obtain the permission of the court and observe the safeguards that are prescribed by the statute. If he chooses not to do so and holds the conversation against the mandate of the statute, then the rule which requires that the person with whom he talked be presented to rebut the presumption of injury, is neither so onerous nor unjust as to justify its disregard. The same is true of separation and of conversations by personal contact. As said in the recent case of Mauney v. State, 85 Texas Crim. Rep., 192: "Not only should the appearance of evil be avoided, by strict observence of this statutory rule forbidding communications with the jury when the court is not present, but the further fact is true that human nature is frail and prone to excuse itself, and it is easily possible to conceive a case where

the party conversing with a juror, as well as the juror himself, fearful of punishment for contempt, might not remember all that passed at such conversations and might deny mention of the case between them by virtue of a convenient memory.''

In Logan v. State, 66 Texas Crim. Rep., 512, the court, speaking through Judge Harper, said: ''It is also shown by the record that the jurors while deliberating on the case were permitted to talk over the telephone to their family and others. . . . We want to condemn the practice of the sheriff and others in charge of a jury permitting them to talk over the telephone or to talk to anyone under any circumstances except in the presence of the court, while the jury is in their charge. . . . If the trial court, when this does occur, would administer to the officer permitting it, the proper punishment for permitting a violation of this law, it would cease, and they would not have to devote day after day to hearing evidence as to whether the defendant suffered any injury by reason of the officer in charge of the jury permitting a violation of this plain provision of the Code.''

The method of meeting the presumption against the purity of the verdict where one of the statutory provisions mentioned has been violated, has often been pointed out in the opinions of the court. See Wood v. State, 84 Texas Crim. Rep., 191, and cases cited therein. In the instant case, to rebut the presumption of injury, in some instances the testimony of some of the jurors alone was used.

Concerning several of the matters complained of in the motion, the State, through the introduction of evidence upon the hearing of the motion for new trial, has overcome the presumption against the verity of the verdict. In others it has not. The persons with whom the various jurors talked over the telephone during their retirement have not been produced; nor their absence accounted for. The women with whom the jurors talked in person were not used as witnesses to give their version of the conversation. One of these jurors was not called to show the nature of the conversation in which he took part. Nothing appears in the record to indicate that these women or this juror were not available, nor to indicate that the persons with whom the jurors claimed to have talked over the telephone could not be produced. It having been conclusively shown that the statutes were violated, the burden was upon the State to meet the presumption of injury by the introduction of such testimony as was available to it. In the absence of so doing, the rule illustrated by the unbroken line of precedents must operate against the verdict. Early v. State, 51 Texas Crim. Rep., 391, and other cases to which we have adverted above. The case of Latham v. State, 75 Texas Crim. Rep., 575, we do not construe as overturning this rule. To so construe it would bring it in conflict with the undoubted weight of authority.

The testimony upon hearing the motion for new trial reveals a series of acts upon the part of the jurors, some of them with the

consent of the officer in charge, which were violative of the statutes enacted to preserve the purity of the jury. Doubtless, before they retired, the members of the jury were warned by the trial judge against separation and against communications with persons other than members of the jury. · One of the purposes of placing an officer in charge of the jury is to prevent the transgression of the statutes mentioned. It too often happens, as. in this case, that after the trial, it is made to appear that the members of the jury have disregarded the statutes and disobeyed the directions given by the court. When such things occur, and were not shown to have been harmless, the courts cannot sanction the verdict without themselves doing violence to the mandatory provisions of the law. They can, however, punish those who, by their transgressions, are in contempt of court. The statute, Article 479, confers upon the trial judge this power and in a proper case, makes it his duty to exercise it. The performance of this duty would doubtless be salutory and tend to prevent the recurrence of such conduct as that which the record in the instant case discloses.

From what has been said, it follows that the plain duty of this court is to refuse to affirm a judgment based upon a verdict, tainted as it is, by the frequent disregard of the statutory law governing the conduct of jurors in their retirement.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*