## J. F. HOGAN V. THE STATE.

No. 16352.  Delivered March 28, 1934.
Rehearing Denied October 3, 1934.
Request to File Second Motion for Rehearing Denied October 24, 1934.
Reported in 74 S. W. (2d) 988.

The opinion states the case.

*Aldrich & Aldrich,* of Edinburg, and *J. Franklin Spears* and *Dave Watson,* both of San Antonio, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, death.

Appellant was convicted for the murder of his wife. They lived some distance out from the town of Mercedes in Hidalgo County, on a ranch, by themselves; their children being grown. Appellant's wife disappeared about the 16th of November, 1932. She was apparently a very hard-working woman, and assisted her husband in carrying on the work of the ranch, rounding up cattle, milking them, dipping them, carrying on the work of her house, etc., etc. It was shown by testimony that she had

been to Harlingen the day before her disappearance and had a permanent wave put in her hair. While engaged in rough work around the ranch she usually wore rough clothing, including a pair of tennis shoes, overalls, etc. Appellant told many stories to account for the absence of his wife. To some persons he claimed that a horse had fallen on her while she was riding the ranch and she was seriously hurt and had been sent to San Antotnio for treatment, and had there died. To others he merely told the story that she had gone to San Antonio. To others he said she had gone off and left him without his knowledge,—that they were riding the pasture together and separated at a certain point, he going one way and she the other, and that when he came back to where they were to meet she was not there; that her horse and saddle were there, and that when he got to the house he found her best clothes were gone, together with sixty dollars which had been paid him as earnest money for the purchase of some cattle. To other people who asked him about the 25th of November, 1932, where his wife was and why she did not come to a certain dance, he said she could not get there on account of the mud. After suspicion had become aroused to the point where serious investigation was being made, parties went to the ranch house and found in what looked like a barbecue pit near the house the charred remnants of the best clothes of deceased, which he had told some persons she had taken with her when she left home. In the lot, near a tree, was found a quantity of blood. About December 2nd a large searching party was organized to make a close examination of the ranch. In a dense thicket some distance from the house two Mexicans located a soft place in the ground. It looked like it had been filled in. They gave the alarm and others came. Without going into minute details, buried in a shallow grave the body of a woman was found whose skull had been crushed in by a blow from some heavy instrument. The body had on it tennis shoes and rough clothes, a gold band wedding ring, etc. A sack was over the head of the corpse; a hard twisted rope was apparently around her neck. From scars on the body and from many other marks of identification a number of witnesses testified that the body so found was that of the deceased. Appellant's trial and his conviction followed. Many criminative circumstances were in evidence which we do not attempt to set out.

Appellant took the witness stand in his own behalf and testified that his wife left home on the 16th of November, and

that he did not know what had become of her. The evidence is very voluminous and embraces the testimony of many witnesses who testified with such positive identification and certainty of description and connection of details, that we have no hesitation in saying the testimony was ample to support the jury's conclusion that appellant was guilty of the murder of his wife.

There are many exceptions found in the record, each of which has received our careful attention in view of the gravity of the punishment, and of the desire on the part of this court to overlook nothing in our effort to ascertain if this case was fairly tried. To take up the bills of exception appearing in the record, ranging from bill of exceptions No. 1 to No. 23, would require an opinion of altogether unnecessary length, and a discussion of many matters worthy of only mention. A number of bills of exception complain of the fact that testimony was given of a search of the premises of appellant and its result; objection being that no search warrant was had. These witnesses testified, as did appellant himself, upon the trial that they had his free and entire permission to search the premises. None of these bills present error.

A stick or club with a spot of blood on the end of it was found near a corner of the shallow grave in which the body was interred. This blood was examined and shown by testimony to be human blood. Several bills of exception are leveled at the introduction of this club, and the opinion of witnesses that it was such instrument as that a blow from it might crush the skull, and to the fact further testified to that the blood on same was human blood. We find nothing in these bills of exception at all erroneous, or appearing to call for discussion.

A great many bills of exception were reserved to the testimony of witnesses upon the question of identification. None of these bills present error. From scars upon the body, and from the condition and color of the woman's hair, the tennis shoes found upon her feet, the garments upon the body, the ring upon her hand, etc., many witnesses, who viewed said body, were permitted to express their conclusion, based on these matters, that it was the body of appellant's wife, the deceased in this case. Many of the witnesses were very positive in their identification. It appears in the record that after the disappearance of his wife appellant was asked to describe what clothes she had on when she left, and he said she wore rubber boots and did not have on the tennis shoes which she ordinarily wore. These he said had become worn out and discarded.

Some of the children of deceased were used as witnesses, and in the course of their examination were asked if they viewed the remains after they were found, and after having answered said question in the negative, they were asked why they did not view said remains. The answer of each appeared to be substantially that they preferred not to look at her body at that time but to remember her as they had seen her and known her. We see nothing in these bills capable of prejudicially affecting the rights of appellant. As the children of deceased, it would be reasonable for them to have viewed her remains after death, and if there was no testimony upon the point, there might have been raised a question in the minds of the jury as to whether or not these children were of opinion it was their mother. There would seem to be no question as to the propriety of admitting in evidence the club found by the grave with blood on it, the rope which was found around the neck of deceased, the sack which was over the head, and such other objects as were around the body. There are other bills of exception apparently having as little ground for objection in them as those which we have noted, to which we will not refer in detail.

Bill of exception No. 8 brings forward for review the following occurrence: After the jury had been impaneled and the case was on trial, a telegram came for one of the jurors announcing the death of his brother in Ohio. Apparently after discussing the matter with counsel for both sides, said juror was segregated from his fellows, and in the presence of counsel was acquainted with the contents of the telegram. The bill certifies that the juror was visibly affected, had tears in his eyes, was agitated and sobbed. He requested that he might discuss with his wife what he should do in the premises in regard to going to the funeral. His wife was sent for, and with the consent of all parties, and in the presence of the court and counsel, said juror talked to his wife, after which he approached the court and informed him he had concluded that it would be impossible for him to go to the funeral of his brother, and that he would prefer to remain on the jury and go on with the trial of the case. He stated to the court that it would make no difference in his attitude, and that he could try the case and give the defendant a fair and impartial trial, and be in nowise affected by the fact that his brother had died. Appellant in person and by his counsel made a motion asking the court to declare a mistrial, and to discharge the jury and continue the case. The court declined to do this. He further

certifies that when the juror came up to him, after having conversed with his wife, to announce his purposes and desires, said juror appeared to have regained his normal composure, and that as far as the court could tell he appeared to be perfectly at himself and able to try the case. It might be further observed that in conection with the motion for new trial, the court had said juror to appear and give testimony, in which he swore that he had lost a large number of the members of his family, and that this brother who died lived in Ohio, and he had not seen him for a number of years, and that he had had very little personal association with him for approximately twenty years, and that during the trial and the hearing of testimony the juror entirely put away from his mind the fact of his brother's death, and that it did not influence him in any way or affect his verdict. We further note that no effort was made on the part of appellant, by the production of any other juror, or in any way, to show that the juror was affected in the jury room, or that anything occurred as a result of this matter which might have appeared even to reflect injury.

We see no reason for holding that this matter was not properly one for the primary decision of the juror, and next for the trial court, and there is nothing before us showing any abuse of discretion of the trial court in declining to declare a mistrial, and in directing that the case proceed. In Torres v. State, 91 Texas Crim. Rep., 386, 238 S. W., 928, we had a case where the trial court declared a mistrial in a case where a brother of a juror had died during the trial, which fact was reported to the court, together with the further fact that the presence of the juror was needed to make arrangements for the funeral, etc. Upon what was thought to be consent in that case, the jury were discharged and proper orders made reciting the facts. Upon another trial a plea of jeopardy was interposed. In disposing of the matter we said: "We are inclined to think that where the record shows an adjudication by the trial court of the fact of the death of a juror's brother during the trial, and of the further fact of the need for the presence of said juror at once to arrange for the funeral, and the discharge of the jury in such event, that we should not hold this any abuse of the necessary discretion confided in the trial court in such matters of practice. Death and illness nigh to death are the most disturbing factors to the human mind when they come to our loved ones, and care for the dead and dying is one of the strongest calls upon affection and humanity, and we do not feel any need to make elaborate argument to support

our conclusion that this was a sufficient circumstance to justify the action of the trial court." A somewhat similar case was that of Woodward v. State, 42 Texas Crim. Rep., 188, in which we held the action of the trial court proper. We have here no similar set of facts or legal question. It must be manifest that our statute contains no such ground for disqualification of a juror as that he has lost a relative, no matter how close. It is also plain that in selecting jurors, those matters involving opinions, feeling and scruples of proposed jurors as described in article 616, C. C. P., are matters whose decision as to the fixedness of opinion, or the extent to which same might affect the juror's action,—are always first left to the decision of the talesman,—and if he feels that he can impartially try the case and render a fair verdict, and be unaffected by what he may have heard or read, his qualification is then for the trial court, and unless there be serious question raised and supported in the record of such import as to lead this court to conclude the rights of the accused have been harmfully affected, the action of the trial court in such regard would be upheld. That is exactly what we held in the cases above cited in which, upon what seemed good ground, the jury was discharged, and regarding which we held it was a proper exercise of the court's discretion.

We have gone carefully over the facts, and considered them in the light of the infliction of the extreme penalty. We have considered the exceptions to the court's charge, and have been unable to agree that any of them present any serious questions of injury. The case was necessarily one of circumstantial evidence, and the State has marshaled its circumstances and presented them so convincingly as to leave apparently no room for doubt in the minds of the jury of the guilt of the accused. We think no error was committed in the introduction of evidence, or in the matter of the charge.

The judgment will be affirmed.

*Affirmed.*

## ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—The bills of exception are numerous. Discussion of them has been made in the original opinion. The evidence heard upon the trial and the record presenting the complaints for review are voluminous to a degree that precludes a detailed discussion upon this hearing.

The matter which the appellant stresses and to which he

specially directs our attention is that presented in bill of exception No. 8, from which it appears that after several witnesses for the State had been examined and cross examined a telegram addressed to E. M. Pendleton, one of the jurors, was brought into court and delivered to the judge presiding. Without informing the jury that the telegram was a death message, the court, after informing counsel for both the State and the appellant that it was a death message and after informing them that it was his intention to do so, delivered the telegram to juror Pendleton. The bill, after setting forth the facts above stated and those embraced in substance in the court's qualification to the bill, states that a mistrial was sought, the request for which was made by the appellant's counsel and also by the appellant in person.

Appellant asked for a mistrial upon the following grounds:

"Comes now the defendant by and through his attorneys and moves this court that a mistrial be declared in this case, and that the jury be discharged, upon the following grounds, to-wit:

"1. Because it appears from the telegram received by one E. M. Pendleton, one of the duly and legally selected and qualified jurors in this case, which telegram was received from Fred Pendleton, and which was sent from Delaware, Ohio, that the father of Fred Pendleton, who is the brother of the juror, E. M. Pendleton, had died, and which telegram is as follows, to-wit:

" 'Delaware, Ohio.

" 'E. M. Pendleton,
" 'Box 834,
" 'Edinburg, Hidalgo County, Texas.
" 'FATHER DIED THIS A. M. ADVISE IF YOU CAN COME.
" 'Fred Pendleton.'

"And the defendant, in view of the fact that this is a murder case is apprehensive of the effect that the said death message may or might have upon the mind of the juror, E. M. Pendleton, and which effect would prevent the juror from being a fair and impartial and unbiased juror, as provided by law and the Constitution of the State.

"2. Defendant further represents to the court that at the time of the said juror's receiving the death message, that the effect upon the juror was very noticeable, in that, the said juror, while discussing the matter with the court, was shedding tears and was in a semi-sobbing condition."

From the court's qualification of the bill it appears that

after the juror, E. M. Pendleton, had discussed the matter with his wife, upon permission and in the presence, but without the hearing of the court and of counsel, he (the juror) stated to the court that both he and his wife had agreed that it would be useless and futile to attempt to go to the funeral, and after discussing it with the court, he stated that he felt that he could and would go on with the trial of the case as one of the jurors, and that his feelings and the loss of his brother would not influence him in any way either for or against the defendant in the case, and that he was entirely willing to remain on the jury and to decide the case fairly alike to the defendant and the State, without reference to the telegram which he had received.

After the juror had assured the court that he would be fair alike to the State and the defendant, the court was satisfied that the juror would be in a proper mental attitude to serve as a juror during the remainder of the trial of said case.

The court certifies that as the juror approached the judge's desk, at the request of the court, after he had ascertained the contents of the telegram, Mr. Pendleton was visibly affected thereby in that he talked to the court with tears in his eyes and his lips and voice trembled, and he stated to the court that he would like to discuss with his wife the question of attending the funeral, and requested the court that he be permitted to discuss the matter with his wife, which request was thereupon immediately granted by the court, by and with the consent of all counsel in the case in the presence of the court, but without the hearing of the court, and without the hearing of all counsel, both for the State and the defendant; and the defendant himself being present in the court room but not within hearing of the juror or his wife. After said juror had conversed with his wife, the court again interrogated the juror and noticed that the juror had apparently regained his normal composure. The juror stated that he had decided not to attend the funeral but would remain on the jury and be a fair juror, that is, fair alike to the State and to the defendant in the case.

The court further certifies that on the motion for new trial the State introduced juror E. M. Pendleton, who testified substantialy as follows relative to the telegram received by him: "That the said juror was approximately fifty-four years old; that he had had about eighteen deaths in his immediate family —his brothers and sisters and their respective children, and that he had not associated with his brother very much in the last twenty years, and hadn't seen him in five years; when

he first read this telegram, it naturally upset him, because it related to the death of his brother; that he didn't know what to do about it until he talked to his wife, and that after the court had allowed him to talk to his wife, by and with the consent of all counsel, that he decided it would be useless for him to think about going to the funeral, because the distance was too far, and it would be too expensive. That the court asked if he wanted to proceed as a juror in the case, and that after he had decided it would be impossible for him to attend his brother's funeral, he made up his mind that it would be best for him to remain as a juror in said cause, and that he made up his mind that the contents of said telegram would not affect him in any way in arriving at a fair and impartial verdict in the trial of said cause, and that the telegram and the contents contained therein did not in any manner affect him in arriving at a verdict in said cause. Witness further testified that the telegram and its contents relative to the death of his brother did not influence him in any way whatsoever, and that during the day when the trial was being held, that he completely and entirely eliminated the matter from his mind, except at night when he went back to the jail where the jury was quartered for the night, he naturally recalled that his brother was dead and thought about it, but that it had no effect on his verdict."

From the bill we quote further: "With the foregoing qualification, the bill of exception No. Eight is found by me, as well as by the State's attorneys, to be correct, and is hereby allowed, approved and ordered filed by the Clerk of the District Court, 92nd Judicial District, Hidalgo County, Texas, as a part of the record in this cause, on this the first day of August, A. D. 1932."

The position taken by the appellant upon this appeal and stressed in his motion for rehearing is the claim that articles 671, 673 and 753, subd. 7, C. C. P., were transgressed in the conduct of the trial. Article 671, supra, reads as follows: "No person shall be permitted to be with a jury while they are deliberating upon a case, nor be permitted to converse with a juror after he has been impaneled, except in the presence and by the permission of the court, or except in a case of misdemeanor where the jury have been permitted by the court to separate. No person shall be permitted to converse with the juror about the case on trial."

Article 753, C. C. P., sets out the grounds upon which a new trial may be had. Subdivision 7 of the article contains the following: "Where the jury, after having retired to de-

liberate upon a case, have received other testimony; or where a juror has conversed with any person in regard to the case," etc.

In support of his contention appellant cites the following cases: Davis v. State, 60 S. W. (2d) 783; Lewis v. State, 58 S. W. (2d) 827; Mauney v. State, 210 S. W., 959; Chappell v. State, 50 S. W. (2d) 327; Gilliam v. State, 296 S. W., 600; Toussaint v. State, 244 S. W., 514.

In considering this appeal note is to be taken of the fact that subdivision 7 of article 753, quoted above, has reference to communications with the jury during their retirement or at least when not in the presence of the court.

Article 671, supra, inhibits unauthorized conversations with a jury at any time after he has been impaneled.

The question under consideration, as presented by the record, is whether there was harmful error committed in the presence of the judge during the trial. It is apparent from the bill of exception and from the record, as shown in the quoted bill, as qualified, that the conversation which took place between juror Pendleton and his wife was in the *presence of the court with the consent of the appellant and his counsel.* It is thought that the bill, as drawn and qualified, justifies the conclusion that the matter in mind at the time the bill was taken is not a violation of article 671, supra, but that the matter before the court was the contention of the appellant that the *mind of the juror after receiving the telegram advising him of the death of his brother was in a condition to render him unfit for service upon the jury in a case involving the death penalty.* Upon the delivery of the telegram to the juror by the messenger boy all parties present and interested were informed of the arrival and contents of the telegram. With the consent of the attorneys the juror was interrogated by the judge. Upon learning that the telegram advised of the death of his brother, the juror requested that he be allowed to talk to his wife. She was sent for with the acquiescence of both the court and counsel. A conversation took place in the presence but not in the hearing of the court and counsel. *No objection was urged at the time.* On the contrary, all that occured was with the consent of the parties. After the conversation with his wife, juror Pendleton indicated his willingness to proceed with the trial. The point made by appellant is that under the circumstances the state of mind of the juror was such as to render him unable to perform jury service in the case. The bill of exception is to the effect that the juror had a conversation with his wife.

*Had objection been made, it apparently would have been within the power of the court to call the wife of Pendleton and receive her version of the conversation which took place between her and her husband.* Pendleton had already communicated to the court the contents of the conversation.

The case must be dealt with here upon the record that was made at the time of the trial. The statute, article 671, supra, declares in substance that there shall be no conversation with the jurors except in the presence and by permission of the court. This was literally complied with in the present instance. We would not be disposed to give the term "in the presence of the court" such interpretation or effect as might, in all cases, sanction a conversation which was not in the hearing of the court.

We are not of the opinion that paragraphs 9, 10 and 11 of the court's charge required or authorized a reversal of the judgment. The paragraphs mentioned must be appraised in connection with the charge. Paragraph 9 of the charge embraces the clear statement that unless the death of the deceased was proved and the body identified as the wife of the accused, there could be no conviction. Paragraph 10 merely defines homicide as the "destruction of one human by the act, agency, procurement or culpable omission of another." Paragraph 11 is to the effect that if there was a failure on the part of the State to prove clearly and satisfactorily beyond a reasonable doubt that the body of Dee Hogan had been found and identified so as to establish the fact of death, there could be no conviction; and further, that the disappearance of Dee Hogan could not be taken into consideration by the jury for any purpose in determining the identity of the body or portions thereof. The exception to the charge in paragraph 9 is to the effect that the charge authorized the conviction of the accused if the body of Dee Hogan had been found and identified, and that the charge does not adequately advise the jury with reference to the corpus delicti. Appellant cites Chandler v. State, 131 S. W., 598; Miller v. State, 13 S. W. (2d) 865.

Paragraph 12 of the charge immediately following and criticised by the appellant is a comprehensive and approved charge on the law of circumstantial evidence. The precedents cited by the appellant and listed above are not regarded as supporting his contention that the charge in question was erroneous or in any sense incomplete.

Appellant possessed a farm and ranch some miles from the nearest city, upon which ranch he and his wife lived alone.

Jarratt Hogan, a son of the appellant, visited the ranch on November 14, 1932, at which time his mother was present. He again visited the ranch on November 18th, and was told by appellant that his wife had deserted him; that she left on November 16th; that the two had been riding in the pasture and driving up cattle; that upon his return she was gone; that search for her was without result. Appellant claimed that her good clothes and some money were also missing. He referred to some money that had been received from the sale of cattle. Appellant told the witness that he had taken his wife to Harlingen on November 15th to have her hair dressed. No notice of the disappearance of the mother was given by appellant to her daughter who lived in San Antonio. On a subsequent occasion, appellant requested his son to suppress the fact that a $20-bill had been taken from some money which was owned by the deceased, and further requested witness to claim that the money was borrowed from his mother by the witness. After the disappearance of his wife, appellant attended a dance on one or more occasions and took part in the festivities. At that time he accounted for the absence of his wife at the dance with the statement that the condition of the roads would not permit her coming. He made several contradictory statements with reference to the absence of his wife. Among them was the statement that she had received an injury from a fall and had been sent to San Antonio; also that she had been sent to San Antonio and had died. In his testimony upon the trial the appellant did not controvert the making of these contradictory statements. With his consent his premises were searched by many people. The body of the deceased was finally discovered in a shallow grave upon the premises of the appellant. The head of the deceased was detached from the body. The body was in an advanced state of decomposition. It was exhumed and taken to a morgue where many people saw and identified it as the deceased. All of them gave testimony to that effect. The children of the deceased gave testimony upon the trial to the effect that they did not look at the body of the deceased but circumstances detailed by many witnesses who saw the body of the deceased left no question that her children were aware of the revolting condition in which her remains appeared. The identity of the body as that of the deceased (wife of the appellant) was established by many witnesses who saw it after it was disinterred, and by various circumstances, including scars upon the arm, a ring upon the finger and the wearing-apparel found upon the body at the time of the disinterment.

The statement of the appellant that the deceased had taken away her good clothes upon her disappearance was controverted by testimony to the effect that parts of them had been found burned in a barbecue pit which was upon the premises of the appellant. It was claimed by the appellant that his wife disappeared on November 16, 1932. According to the testimony, upon that date he had made an engagement to deliver some cattle which he had sold. When the purchaser went to the ranch of the appellant to receive the cattle, he was informed by appellant that they had not been dipped according to his promise. It became necessary for the purchaser to return without the delivery. The purchaser described the conduct of the appellant upon the occasion and related that he had considerable difficulty in finding them. After finding the cattle upon his premises, appellant confessed that it was his fault in failing to have them ready for delivery and made an appointment to do so on the following day. The appellant's cattle were mortgaged. Upon calling on the following day (November 17th) the witness was informed by appellant that his wife had been seriously hurt when thrown from a horse and had been taken to San Antonio on the previous day, which was November 16th. On the previous visit of the witness to the appellant's home he had seen the deceased there. Neither on the 16th nor on the 17th of November, when he received the cattle, was she seen by him. The witness was told by the appellant that his wife had left him.

While searching for the body of the deceased, blood was observed upon the root of a tree. The tree also had blood upon it and there was a puddle of blood near the root of the tree. Part of a root of a hackberry tree was discovered and exhibited upon the trial. It was found a few feet from the blood mentioned. The root was about eighteen inches in length and was bloody. It was partly covered with dirt. This root was found near the barbecue pit in which corset staves and other objects of apparel were found partly burned. The blood upon the objects mentioned, namely, the twig and the root, were pronounced by an expert physician to have been human blood.

Appellant claimed that when his wife disappeared she was wearing his rubber boots. The disinterment revealed that she was wearing tennis shoes which she was accustomed to wearing.

Some of the articles disinterred with the body were preserved and exhibited upon the trial. Some were destroyed due to their condition. The club was shown to weigh about seven

or eight pounds. The clothes worn by the deceased at the time of the disinterment were exhibited to the children of the deceased and identified by them, as was likewise the ring upon her finger.

Appellant made threats to kill the persons who were searching his premises. However, he afterwards retracted them.

Many circumstances, due to the examination of the barbecue pit and its contents, tended to controvert the appellant's contention that his wife's good clothes had been taken away by her.

The body of the deceased was found about 2500 feet from the dwelling-house and was on the premises occupied by the appellant. The testimony of the doctor was to the effect that the skull of the deceased was fractured. There was a fracture four or five inches in length. The side of the skull on the left was sunken down where the greatest injury had taken place. The top of the skull was also sunken about a quarter of an inch and crushed down. The doctor expressed the opinion that death resulted from the fracture. Apparently the examination indicated that death was instantaneous. The wound bore the appearance of having been inflicted with some heavy club or object of that kind.

Bills of exception Nos. 13, 15 and 16 relate to substantially the same matter. Jarrett Hogan, a son of the deceased, after testifying that he did not look at the body of the deceased, was asked by the district attorney the following:

"Q. Why didn't you? A. No one requested it and I did not want to look at it."

Another member of the family, answering a similar question, said: "I wanted to remember my mother the way I last saw her." Another said: "I did not view the body on account of the state of decomposition, and I did not care to see my mother that way." Similar testimony was given by other children of the deceased.

The circumstances under which the declarations of the children that they did not want to see the body were made exclude the idea that the remarks challenged were prejudicial to the appellant.

The cases cited by the appellant, namely, Godsoe v. State, 108 S. W., 388; Garrett v. State, 106 S. W., 389; Rangel v. State, 22 Texas App., 642; and Thompson v. State, 123 S. W., 593, have been examined. The citations are not discussed in detail as they are not regarded as supporting the contention of the appellant under the circumstances developed by the present record. The testimony of Jarrett Hogan, set out in bill No.

13, of which complaint is made, came into the case upon re-direct examination after extended cross examination by the appellant's counsel.

The evidence adduced upon the trial, measured by the strict rule demanded by the law governing circumstantial evidence, cannot, we think, justly be regarded as inadequate to support the conclusion of the jury that the appellant, with malice, murdered his wife in the manner and by the means declared in the record.

After the most careful examination and consideration of the record, nothing has been perceived in the trial which would authorize a reversal. We are constrained to decline to set aside the finding of the jury which has the approval of the trial judge who heard all of the evidence. It is therefore the duty of this court to overrule the motion for rehearing, which is accordingly ordered.

*Overruled.*

### ON REQUEST TO FILE SECOND MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant has presented a request for leave to file a second motion for rehearing, which contains fifty-four pages of typewritten matter. It has all been read and considered. We regret to note that many things are stated in the motion which find no support in the record. It is not claimed that this court has overlooked any question presented. The only claim is that we have reached a wrong conclusion regarding some of them. As to the rules controlling on second motion for rehearing see Hickman v. State, 93 Tex. Crim. Rep., 407, 247 S. W., 518; Calley v. State, 103 Tex. Crim. Rep., 53, 279 S. W., 848; Webb v. State, 9 S. W. (2d) 335. We are not persuaded that under the facts in the present record we reached a wrong conclusion in disposing of appellant's contentions, and the request for leave to file the second motion for rehearing will be denied.

*Denied.*